### GANS S. S. LINE v. WILHELMSEN et al.*

### THE THEMIS.

(Circuit Court of Appeals, Second Circuit. July 29, 1921.)

#### No. 177.

1. **Appeal and error ⬦173(2)—Point not considered below not considered on appeal.**

    In libel against owner of vessel for nondelivery under charter party entitling libelant to vessel during winter season, in which owner impleaded charterer entitled to possession during summer season, alleging such charterer's failure to deliver to owner to be responsible for owner's nondelivery to libelant, the objection that the charter with libelant had been entered into by an individual who had organized the corporation owning the vessel, whereas, the charter with such other charterer was executed in the name of such corporation, *held* not open to consideration on appeal, where the point was not noted below and was not referred to in the pleadings, and where both the individual and the corporation appeared and answered as owners, and where Admiralty Rules, Nos. 6–9 (267 Fed. viii, 1x) were not complied with.

2. **Shipping ⬦40—Delivery of vessel by one charterer to owner held not a condition precedent to owner's delivery to other charterer.**

    Where owner of vessel, charterer during winter season, and charterer during summer season agreed as to dates between which vessel was to be delivered by summer charterer to owner and by owner to winter charterer, the owner was required to deliver at such time, notwithstanding provision of charter requiring vessel to be "placed at the disposal of the charterer * * * upon redelivery by" summer charterer, since such provision as to redelivery by summer charterer was merely a description

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 256 U. S. —, 42 Sup. Ct. 97, 65 L. Ed. —.

of the relation existing between owner and its seasonal charterers, and did not make such redelivery a condition precedent to winter charterer's right to delivery.

**3. Shipping ⊙═40—Overlap doctrine held inapplicable.**

Where owner of vessel, charterer for summer season, and charterer for winter season agreed as to the dates between which the vessel was to be delivered by the one charterer to owner and by owner to the other charterer, a charterer was not entitled to additional time for delivery under the "overlap" doctrine, the parties themselves having allowed a margin for contingencies by division of seasons by period, rather than named days.

**4. Shipping ⊙═52—Closing of Panama Canal by Culebra slide not an "act of God."**

Charterer's inability to pass through the Panama Canal on closing of canal because of the Culebra slide on canal's bank, did not excuse failure to deliver vessel to owner at required time under provision of charter excepting charterer from liability where such failure was caused by an "act of God," since the closing of the canal in such case was the result, which could have been expected, of a deliberate widening of the canal, which in its entirety was a bold and daring experiment of human activity.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Act of God.]

**5. Shipping ⊙═52—"Act of God" due to natural causes, without human intervention.**

An act of God is due to natural causes, without human intervention.

**6. Shipping ⊙═39—Exceptions in charter parties protect both owner and charterers.**

Provisions of charter parties making certain dangers "always excepted" protect both owner and charterers, whether the word "mutually" is inserted or not, unless the context clearly shows an intention to protect owner only, or possibly charterers only.

**7. Shipping ⊙═62—Contract, evidenced by bills of lading issued by master of chartered ship, obligates owner as well as charterer.**

When the master of a ship, chartered but not demised, issues bills of lading, the contract evidenced thereby is not only the ship's contract and that of the charterer who caused their issue, but in addition is the contract of the owner whose master issued them.

**8. Shipping ⊙═56—Subcharterer required under indemnification clauses of charter parties to save charterer and owner from liability growing out of bills of lading issued on behalf of master.**

Owner, charterer, and subcharterer were all three personally liable for the fulfillment of the bills of lading, issued by subcharterer on behalf of master, with authority to sign for master, but subcharterer, where charter parties contained indemnification clauses, was bound to save the charterer and owner from such liability.

**9. Contracts ⊙═143—Construed as a whole.**

Every phrase of every commercial contract, including the exceptions, is to be construed in the light of the whole document, to the end that there shall be no more overlapping of phrases than is necessary, and in the light of matters known of all men, and capable of judicial cognizance.

**10. Shipping ⊙═52—Closing of Panama Canal because of Culebra slide held an "accident of canals."**

The closing of the Panama canal because of the Culebra slide *held* an "accident of canals" within charter party, making a charterer not liable for "accident of canals."

**11. Shipping ⊙═52—Closing of canal held not to excuse subcharterer from delivery of chartered vessel at specified time.**

Where subcharterer accepted goods for shipment from New York to Australia in their "Australian line" without committing itself to trans-

port such goods by the particular vessel which was in its possession under a subcharter, the mere fact that the Panama Canal, through which it had been intended to make the trip, was closed when ship reached it by reason of slides on the banks of the canal, so that it was necessary, if the ship was to proceed with the cargo, for it to sail around the Cape, did not excuse subcharterer's failure to deliver vessel to charterer at the time specified in the subcharter, though subcharter provided that subcharterer should not be responsible for accidents of canals, since such accident did not prevent subcharterer from performing its obligation to deliver shipment and also deliver vessel at specified time, in the absence of evidence that the cargo could not have been delivered in another vessel, notwithstanding that it would have been difficult, dangerous, and enormously expensive to so do.

12. **Shipping** ☞58(2)—**Burden of proving impossibility on party pleading it.**
Subcharterer, claiming to be excused from nondelivery of vessel to charterer at required time by reason of commercial impossibility, had the burden of proving such impossibility.

13. **Shipping** ☞58(3)—**Measure of damages for nondelivery of vessel to charterer stated.**
In charterer's action for nondelivery of steamer during the abnormal conditions of the great war, at a time when it was impossible for the charterer to secure another vessel similar to that chartered, the measure of damages was what the charterer could have obtained for the steamer in the market had it been delivered to charterer in time.

Ward, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Gans Steamship Line against Wilhelm Wilhelmsen and another, as owners of the steamship Themis, and the Nova Scotia Steel & Coal Company, Limited, and Barber & Co., Inc., impleaded. Decree for libelant (The Themis, 244 Fed. 545), and respondents appeal. Affirmed as modified.

Suit is by Gans Line for breach of a charter party made to it, for Steamship Themis, and by Wilhelmsen as owner. It is now admitted that title to Themis was and is in the respondent corporation (Aktieselskabet), which Wilhelmsen had formed. Apparently for this reason both Wilhelmsen and his company were made respondents as owners. The other respondents were impleaded under the equity of the fifty-ninth rule in admiralty (29 Sup. Ct. xlvi) for reasons apparent from the facts now to be stated.

In March, 1910, while Themis was still unfinished, and not yet named, she was chartered in such manner as to arrange her employments for the next 10 years. The first charter was to Nova Scotia Company, and the second, made only three days later, to Gans Line. It is agreed that each charterer knew, and knew before Themis entered any employment, all about the rights of the other; and we find that the chartered arrangements of the steamship as made in March, 1910, were equivalent to a tripartite agreement, between owner and the two time charterers, by which Nova Scotia Company was to have the steamer for the summer season, and Gans Line for the winter. The seasons were not defined in terms, but the result intended and agreed upon was reached by fixing the times when, or the periods within which Nova Scotia Company should deliver to owners, who would then deliver to Gans Line, which in turn promised redelivery to owners, which would then recommence the cycle by again handing the ship over to Nova Scotia Company.

Accordingly owners agreed to deliver Themis to Nova Scotia Company each year at Wabana (Canada) between April 1 and May 15; and Nova Scotia's counter agreement was to redeliver annually at Philadelphia or Baltimore between the following December 15 and January 5.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Similarly Gans Line was entitled to delivery from owners at Philadelphia or Baltimore, between the same December 15 and January 5; and it agreed to redeliver between March 10 and April 10, at a U. K. port or on the continent of Europe between Bordeaux and Hamburg, Rouen excepted. This bargain gave owners at least 35 days (April 10–May 15) to get Themis from a European port to Wabana, for annual delivery to Nova Scotia Company.

The exception clauses in the first made charter (Nova Scotia's) read as follows: "That should the steamer meet with any casualty causing her to be withdrawn from Charterers' service temporarily or permanently, all hire paid in advance and not earned, reckoning from the date of such casualty shall be returned to the charterers with interest at 5 per cent. per annum from said date. Owners are also to pay charterers for the value of any of charterers' bunker coals that are consumed while the steamer is off hire, based on the current price of bunker coal trimmed into bunkers at the port steamer is in when off hire, but if steamer is at sea when off hire occurs, then price to be based on current rate at the port steamer is first in after her period off hire. The act of God, the king's enemies, loss or damage from fire on board, in hulk or craft, or on shore, arrest or restraint of princes, rules, and people, collisions, any act, neglect, or default whatsoever of pilot, master or crew in the management or navigation of the ship, and all and every danger and accident of the seas, canals and rivers, and of navigation of whatever nature or kind always excepted. The vessel to have liberty to call at any ports in any order, to sail without pilots, and to tow and assist vessels in distress, and to deviate for the purpose of saving life or property."

The Nova Scotia charter also contained the usual employment and indemnity paragraph, as follows: "That the Captain (although appointed by the owners) shall be under the orders and direction of the charterers as regards employment, agency, or other arrangements. Bills of lading are to be signed at any rate of freight the charterers or their agents may direct, without prejudice to this charter, the captain attending daily at the office of the charterers or their agents; the charterers hereby indemnify the owners from all consequences or liabilities that may arise from the captain so doing."

The substantially cotemporaneous Gans charter contained the following stipulation as to the time allotted to Gans: "That the said owners agree to let, and the said charterers agree to hire the said steamship from the time of delivery for nine (9) consecutive winter seasons, commencing with 1911, steamer to be placed at the disposal of the charterers at Philadelphia or Baltimore at owner's option upon redelivery by the Nova Scotia Steel & Coal Co., between December 15th and January 5th each season as called for by charter arranged for this steamer between owners and the Nova Scotia Steel & Co. covering nine (9) consecutive Wabana seasons commencing 1911."

The exceptions of the Gans charter are these, viz: "That should the vessel be lost, freight paid in advance and not earned (reckoning from the date of her last being heard from) shall be returned to the charterers. The act of God, enemies, fire, restraint of princes, rulers, and the people, and all dangers and accidents of the seas, river, machinery, boilers, steam navigation and errors of navigation, throughout this charter party, always mutually excepted."

The employment of Themis, as above outlined, continued (so far as shown) without difficulties or disagreements until the summer season of 1915, when the Nova Scotia Company, being in possession of the steamer, subchartered her (as it had right to do, and at a profit of over £5000 a month) to Barber & Co. for eight months from April 28, 1915. This subcharter therefore expired December 28th, but by a special clause it was agreed that Barber was to redeliver at a port north of Hatteras, "not later than January 1, 1916." It is proved that Barber & Co. contemporaneously knew of the other chartered engagements of Themis; and it is obvious that this firmly fixed redelivery date enabled Nova Scotia Company to ensure the handing over of the steamer to the Gans Line by January 5, 1916.

The Barber subcharter contained the following exceptions: "The act of God, the king's enemies, loss or damage from fire on board, in hulk or craft, or on shore, arrest or restraint of princes, rulers and people, collisions, any

act, neglect, or default whatsoever of pilot, master or crew in the management or navigation of the ship, and all and every danger and accident of the seas, canals, and rivers, and of navigation of whatever nature or kind always mutually excepted."

The employment and indemnity paragraph of the subcharter was identical with that above quoted from owners charter to Nova Scotia Co.

In August, 1915, Barber & Co. advertised Themis as about to sail in their "Australian Line," and took on general cargo for New Zealand and several ports in Australia. To shippers they issued bills of lading signed by them "for the master," which bills reserved to the carrier the fullest possible rights of transhipping by any vessel or line, and to delay, deviate, or overcarry. Freight was to be prepaid, and deemed earned on shipment, "Ship lost or not lost," and among the exceptions was the same form of words as to dangers and accidents of canals, found in Barber's subcharter, and Nova Scotia's charter.

It was intended to make the Australian voyage from New York, by the only route possible if the steamer was to be "north of Hatteras" on January 1, 1916, viz. the Panama Canal.

As soon as Themis was advertised to sail as above, and early in September, Gans Line protested to owners that the voyage could not be accomplished within chartered limits; owners passed the protest on to Nova Scotia Company, who repeated it to Barber ten days before the steamer sailed. The latter promptly replied in writing, "We fully expect to get this steamer back in the time limits of the charter."

Themis sailed with a general cargo on September 12th, arrived at Colon on the 21st, and found the canal closed by slides on the east bank. Then followed the great Culebra slide on the west bank, which produced on October 4th an official notice that the canal would remain closed indefinitely. It was not again opened to commerce until long after January 1, 1916.

On October 5th, pursuant to Barber & Co.'s orders, Themis sailed from Colon for St. Lucia, and arrived October 11th; there coaled and found orders for Durban and Australia. At Durban she coaled again (November 11th), but otherwise proceeded straight for New Zealand; called at seven ports in New Zealand and Australia, started back on February 23, 1916, remained at Buenos Aires and/or Montevideo 13 days, procuring more cargo, and arrived in New York on May 5th,—or after the expiry of Gans Line's chartered period.

The apostles do not show any renewal of protests on the part of owners or charterers when the vessel was ordered to go around the Cape, nor does it appear how soon after October 5th they or any of them learned of this change of programme. The president of, and chief witness for, Gans Line swore he did not know of it, nor of the closure of the Canal, as late as October 25, 1915. We are of opinion that none other than Barber & Co. of the parties to this suit knew of the voyage around the Cape until after the steamer was in mid-Atlantic.

The Themis is a cargo boat of unusual size, and left New York with at least 11,000 tons of goods aboard. When asked as to the propriety or possibility of transhipping at the Isthmus, the vice president of Barber & Co. testified that it was "not entirely impossible," but it was not "just a question of price," because "our reputation in taking care of other people's goods—the underwriters, the shippers—there were all those things to consider in the trade," wherefore Barber & Co. "did not try," and from the evidence did not even consider, any other course than to keep the ship, and send her on a voyage known to require about the time actually expended.

By November 5th Gans Line certainly knew what had occurred, for they then advised the owners of the facts. Some efforts at a direct accommodation between Gans and Barber were made, but terminated on or before December 9th, when the former (by an attorney's letter) notified owners' agents in New York that it would seek other tonnage to replace Themis, holding owners responsible for loss in so doing.

Shortly after January 5, 1916, this libel was filed, claiming damages for nondelivery of Themis under the charter party to Gans Line above described. The owners brought in Nova Scotia Company, alleging that corporation as responsible for such nondelivery, and obliged to indemnify the owners for any liability to Gans Line.

The Nova Scotia Company similarly petitioned against Barber & Co., whose pleaded defense is that the Themis "was bound to transport [her] cargo in accordance with bills of lading issued therefor," and that this had been done "with the utmost diligence and despatch," and the steamer delivered "as promptly as possible after the closing of the Panama Canal," a misfortune resulting from the slides above referred to which were both acts of God, and a danger and accident of canals.

After prolonged trial the District Court held (The Themis, 244 Fed. 545) the owners liable under their contract to Gans Line, and Barber & Co. not excused by any exception in their charter party for so appropriating the Themis beyond their own chartered period, while Nova Scotia was responsible to owners for the subcharterers' dereliction. The damages therefore (assessed at $508,727.42) were ordered paid by Barber & Co., any unpaid balance to be discharged by Nova Scotia Company, and any sum not paid by the impleaded respondents to be settled by the owners. This appeal followed.

Burlingham, Veeder, Masten & Fearey, of New York City (R. H. Hupper, Charles C. Burlingham and Homer H. Breland, all of New York City, of counsel), for Wilhelm Wilhelmsen.

Harrington, Bigham & Englar, of New York City, (D. R. Englar, and Herman Goldman, both of New York City, Elkan Turk and Dix W. Noel, of New York City, of counsel), for Barber & Co., Inc.

H. Alan Dawson, of Philadelphia, Pa., for Nova Scotia Steel & Coal Co., Ltd.

Haight, Sandford, Smith & Griffin, of New York City (Charles S. Haight and Wharton Poor, both of New York City, of counsel), for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The singularity of the facts, and wide range of arguments at bar, has seemed to justify the foregoing amplified statement of things proven, which is, however, merely an extension, not a varying, of the fact findings in the careful opinion of Learned Hand, J., in the court below.

[1] For what reason, if any, the owner of Themis is stated as Wilhelmsen in the Gans charter, and as the Aktieselskabet in that of Nova Scotia, does not appear. It is now admitted that the corporation was the owner in point of fact. On this Barber & Co. base the argument that since Gans Line contracted with the individual, and Nova Scotia Company with the company, libelants can have no claim against Nova Scotia, and therefore none against Barber. No such objection is raised by Nova Scotia Company; both Wilhelmsen and his corporation appeared and answered as owners, and the pleadings contain no reference to the point, nor was it mooted below. Even were it substantial, which we do not believe, it cannot be presented to us without compliance with our admiralty rules 6-9 (267 Fed. viii, ix). No such compliance has been attempted, and we decline further consideration of the matter.

The outstanding and admitted fact in this case is that libelant lost its whole 1916 term in Themis, at a time when this neutral (Norwegian) vessel had peculiar value. This is the confessed damnum. Whether injuria also exists depends upon ascertaining (1) what, if any, human action caused the damnum in point of fact, and (2) whether by

contract the actor is protected from the normal consequences of his act.

[2] For libelants' purposes it is, of course, enough to hold the owner, with whom alone it had direct contractual relation. It was an act (i. e., omission) that Wilhelmsen did not hand over Themis to libelant on January 5, 1916. But here, at the very opening of the case, owners seek escape by the plea that the above-quoted section of Gans charter only required the steamer to be "placed at the disposal of the charterer * * * upon redelivery by" Nova Scotia Company, wherefore it is urged that no liability arose until that company did redeliver.

But the whole section in Gans charter must be read, in order to reach the intention of parties, and, so read, it is plain that the phrase "upon redelivery" by Nova Scotia Company is but a description of relation existing between owners and their seasonal charterers; it is not a condition precedent to delivery. This point is well disposed of in the opinion of Learned Hand, J.

But the holding rests on a broader foundation, viz. the interlocking nature of the charters of March, 1910. What was then agreed to was a regular seasonal division of Themis' time; that time division was of the essence, and its primary importance is manifest, because the only way in which the complementary charters could be fulfilled was by holding all parties to strict conformity in respect of times for delivery and redelivery. The practical observance of these times for four years, by the practical men handling the ship, is abundant evidence of their intent, if anything more were needed than knowledge of the circumstances attending the making of the charters. It follows that owners were bound to deliver to Gans not later than January 5, 1916, unless relieved by some applicable exception in the charter.

[3] The foregoing, however, leads to a broader holding—one affecting all the charters under consideration. It is that none of the charterers can invoke the doctrine of what are called the "overlap" cases. That these decisions all rest on an implication of intent in the parties contracting was pointed out in Schoonmaker Co. v. Lambert Co. (C. C. A.) 269 Fed. 583. No such implication is here possible, for the intent to make time a primary or dominant factor in the contracts is apparent. Indeed over- and under-lap is but one method of allowing a reasonable "lee way" in performing service with something so subject to peril and delay as a ship. In this instance that "lee way" or margin for contingencies was fully and specifically allowed for by division of seasons by periods rather than named days.

So far then as owners' liability is concerned, it remains but to inquire whether any exception relieves. None is or can be suggested except the "act of God," for the Gans charter contains nothing regarding dangers of canals.

It is worth noting that to render any exception available, it is not enough to prove a fact or set of facts answering the language of exception; it is just as vital to show that such facts prevented (in the legal signification of that word) performance of the substance of en-

gagement. But if the facts do not measure up to the definition, further investigation is idle.

[4] Hence it disposes of owners' defense to the libel to hold, as we do, that the slides causing closure of canal in October, 1915, were not the "act of God," as that phrase has been authoritatively accepted.

[5] Without attempting finality in definition, an act of God is due to natural causes, without human intervention. There are other requirements, but we have gone far enough. The Culebra slide which blocked traffic for months after October 4, 1915, was the result, and the not surprising, nor wholly unexpected result, of a deliberate widening of the Canal, which in its entirety was a bold and daring experiment in human activity. The experimental stage was by no means over when Themis sailed, and that fact was well known to all men skilled in engineering. The cases are collected in 1 Corp. Jur. 1174, and see especially Gleason v. Virginia, etc., Ry., 140 U. S. 435, 11 Sup. Ct. 859, 35 L. Ed. 458. It follows that libelant was properly granted recovery against owners.

To adjust rights as between owners, and the other respondents requires further inquiry as to what act caused libelant's damnum. It begs the question to say that it was either the Culebra slide or the closing of the Canal, for neither physically injured the steamer. It was Barber & Co.'s order to go on via the Cape, an order of which no other party to this suit had knowledge until the Themis was halfway to Africa, at the earliest.

It may be said that the other respondents were present at Colon, in the person of the master, and therefore knew. But that is a legal inference. The fact remains that Barber's orders for Australia, given by wire at St. Lucia, were the proximate cause of libelant's loss, but that fact does not fix nor transfer liability, which depends upon the true construction of all three charters at bar in respect of redelivery obligations, and of the Nova Scotia and Barber charters as to liability of respondent's inter sese.

One other question of fact requires mention. Throughout this cause it has been charged that if Barber & Co. did not know that the Australian voyage could not be completed via Panama in time to save Gans' rights, any reasonable man would have known it. We agree with the court below that this charge is unfounded. Judging by Themis' past performances there was plenty of time to make the trip, provided the subcharterers availed themselves of the privileges reserved in their bills of lading, and transhipped goods for the smaller Australian ports. It was not undertaking the voyage via Panama that caused loss, but continuing it from St. Lucia via the Cape.

Taking up now the interpretation of charters, it is plain that Barber & Co. were just as firmly bound to observe the date of redelivery as was every other party, and for the same reasons—positive covenant and consenting foreknowledge of its importance.

It is next observable that in charter to Nova Scotia Company certain dangers are "always excepted," while in that to Barber & Co. substantially the same dangers are "always mutually excepted"; and on

this difference is grounded the assertion that, while Barber can claim exemption as against Nova Scotia, the owners only can avail themselves of the exceptions in their contracts with the latter company.

Doubtless the exceptions of a charter, varying in details, but for generations familiar in kind, were long generally thought to be inserted for the benefit of owners only. When voyage charters were almost the only kind in use, and charterers expected to lade their own cargo, this was natural. With the growth of time chartering, and the rise of a business of which the Themis' engagements is an extreme example, the propriety of equality between contractors became apparent, for such contractors used vessels in the same way, although one was owner and the other charterer; i. e., both hired out the ship or some part of her capacity to third parties. Therefore "mutually" was inserted, although in most contracts mutuality is assumed.

Touteng v. Hubbard, 3 B. & P. 291, decided in 1802, sets forth the early view; and the matter has been discussed rather than decided during the last 25 years in England. Barry v. Peruvian Corp., 2 Com. Cas. 50; Newman, etc., Co. v. British, etc., Co., 8 Com. Cas. 87; Braemont v. Weir, 15 Com. Cas. 101; Embiricos v. Reid, 19 Com. Cas. 263. In none of these cases was the point necessary to decision, but it has been plainly said that exceptions may be available to both parties without the insertion of "mutually," and this view we regard as consistent with the general law of contracts.

In this country the question has never been mooted, so far as we can discover. Clyde v. West India Co., 169 Fed. 275, 94 C. C. A. 551 (the nearest case in this court) did not present it.

[6] With authority lacking, but the English dicta inclining toward what we regard as the reason of the matter, we hold that such exceptions in charter parties as are here presented are intended to protect both owners and charterers, whether the word "mutually" is inserted or not, unless the context clearly shows an intention to protect owners only, or possibly charterers only.

Since, as shown in our fact statement, Barber's defense as pleaded rests fundamentally on an alleged superior obligation to shippers, evidenced by the bills of lading, it is necessary to examine, not only Barber's duty, but the liabilities thrust upon the other respondents, by the employment sections of charter and subcharter, and especially by the direction given the master to sign bills of lading as ordered by charterers.

[7, 8] It is sufficiently shown in Judge Hand's opinion that by acceptance of cargo, the ship became liable in rem for due performance of the contract of affreightment. But when (Barber & Co.'s authority to sign for the master being undisputed) the master of a ship chartered but not demised, which was the condition of Themis, issues bills of lading, we hold that the contract evidenced thereby is not only the ship's contract, and that of the time or other charterer who caused their issue, but that of the owner, whose master (i. e., authorized agent) issued the same. Therefore in this instance the shippers had, beyond the obligation of the ship, the right to look to all three respondents, and hold any or all of them personally liable for right fulfillment of

the bills. This point also seems new in American courts, but it is well settled in Great Britain (Tillmans v. Knutsford, 13 Com. Cas. 244, 334; Manchester Trust v. Furness, 8 Asp. M. C., 57), where it is far more likely to be urged, owing to the weakness of maritime liens in the English admiralty.

But it does not follow from this ruling, that as between themselves, owner, charterer, and subcharterer made but one carrier entity; on the contrary, inter sese the Australian venture from its inception was Barber's alone, and by the indemnification clauses of the charter parties that respondent was and is bound to save the others from any liability growing out of Barber & Co.'s method of performing the contracts of carriage evidenced by the bills of lading issued by Barber for the master.

We have already indicated the nature of that contract of carriage, but now emphasize the point that there was no obligation to fulfill it with Themis; there was an agreement to get the goods to Australia, but by multiplied provisions, unnecessary to quote, that agreement would be fulfilled, though there were transshipments "at any place or places." In short the document is a thorough "war bill"; and, as above stated (and pleaded), it contained the exception, running through both the respondents' charters, of danger and accident of canals.

To fully consider not only Barber's pleading, but the relation of respondents to each other, it is now necessary to decide whether the Culebra slide was an accident or danger of canal. Authority is absent, owing to the novelty of such constructions as that at Panama. Cases of freezing of rivers and canals (e. g., Allen v. Mercantile, etc., Co., 44 N. Y. 437, 4 Am. Rep. 700) are of no assistance, for freezing plainly responds to the phrase "act of God."

[9, 10] Every phrase of every commercial contract, including the exceptions, is to be construed in the light of the whole document, to the end that there shall be no more overlapping of phrases than is necessary, and in the light of matters known of all men, and capable of judicial cognizance. Canals for deep water vessels had been known since Suez at latest, Panama was building when Themis was launched, and "dangers of navigation" would cover stranding on unknown shallows in any navigable waters, including canals. Hence we conclude that "accident of canals" should reasonably cover catastrophic events, short of acts of God, by which the Canal temporarily ceased to exist; and the Culebra slide was such a happening.

[11] Thus is reached the final question: Did this accident of canals, in fact or by law, prevent Barber & Co. from performing either or both of their engagements, viz. their chartered obligation to redeliver, and their contracts of affreightment as stated in bills of lading.

In point of fact, there was no physical prevention. Barber & Co. have not in evidence attempted to prove that it was physically impossible to tranship. To be sure they did not even "try" at the time; but under the exigencies of suit they have given much evidence regarding the difficulties and dangers of unloading and reloading cargo at the Isthmus; there is no evidence regarding conditions at the nearer North American ports, those in the West Indies, at Durban or nearer

in Africa,—nor anywhere else in the world sufficiently near to "north of Hatteras" to enable redelivery to be made.

Indeed, this part of Barber's defence rests on what in argument is called "commercial impossibility," which on the evidence is no more than emphasis on the expense of keeping both engagements; and the result of the contention is undisguisedly that it would have cost Barber & Co. so much to keep both promises that therefore they have the right to put the loss on some one else, a contention sufficiently treated in the opinion below.

[12] But assuming that the doctrine of commercial impossibility might ·be invoked, the evidence does not require us to discuss it, in point of law. If impossibility of performance, commercial or otherwise, or the same thing disguised as "frustration of venture," be a defense (as it sometimes is), it is one whereof the burden of proof is very heavily on him that advances it, and this record does not show effort anywhere, nor even the probable results thereof at any place, except at the Isthmus. This is not enough.

But taking Barber's testimony at its fullest value, and holding that it would have been difficult, dangerous, and enormously expensive to deliver Themis cargo otherwise than in Themis, failure to redeliver by January 1st is still not excused. Assume that all the respondents had agreed with shippers to get that cargo to Australia, it remains true that they had agreed with each other than Gans Line should have the steamer by January 5th. Therefore it was their duty, and that of each of them, so to arrange their commitments as to keep all their contracts; and this they did by the form of bill of lading used. That bill left it possible to keep all engagements, under all circumstances that actually occurred, and, as between themselves, the duty of getting the goods to Australia was on Barber & Co.—assuming that the other parties did nothing to hinder or prevent them.

If the bill of lading had not permitted all the varieties of carriage that it did, if it had committed Themis to go to Australia, and the slide had happened as it did, the case would have been wholly different. Again, if the steamer had gone through the Canal in September, and, when entering Balboa on her return trip, had encountered a canal closure in latter December, the exception of accident of canal would have taken on quite a different meaning, or produced a different result.

It is further urged that owners have no recourse to the other respondents because all respondents acquiesced in "continuation of the voyage, after the Panama Canal was closed." This is the legal inference above referred to, and rests on the truth that by the master the owner was at all times in possession.

The point becomes this: Either the master on his own responsibility should have refused to leave St. Lucia for Durban, or the owners or charterers should have ordered him at Durban to turn back. After Durban it was too late. There is no proof as to radio possibilities, nor evidence that Themis had a wireless apparatus.

As to the first possibility, it was the master's duty under the employment article to obey all lawful orders of the subcharterer; there was

nothing obviously unlawful in the order. As to the second, the damage was done by that time. It was best to let bad enough alone.

If it were true in fact that all the respondents united in doing something for the pecuniary profit of Nova Scotia Company (which gained £5,000 for every month Barber & Co. detained the Themis from Gans), and to save Barber from transhipping expenses, much might still be said, on other grounds, for holding all respondents; but on the record it is enough to sum the matter up thus: The canal accident exception did not relieve Barber & Co. from carriage to Australia, because it did not prevent such carriage; the same exception did not relieve from the duty of timely delivery because there was no physical prevention of delivery, no proven "commercial impossibility" of delivery, and there was, under the bills of lading, a way to keep all lawful engagements, which is the highest duty of all men.

We have assumed throughout this case that all exceptions apply as completely to the primary or dominant duty of redelivery as to all or any other obligations. It is not necessary to discuss the possibilities of its importance.

It follows that the decree appealed from is right as to its findings of liability, and directions as to order of payment.

[13] The measure of damages under the abnormal condition of affairs during the great war is very perplexing. All parties concede that the Gans Line could not secure a steamer like the Themis. We do not think that it was its duty to secure two steamers aggregating her dead weight tonnage. To estimate the profits it would have earned had it received and used the steamer involves speculation to a degree, which as the Commissioner and the court below found, makes such a measure entirely unsatisfactory. It seems to us that the fair measure of damages is what the Gans Line could have got for the steamer in the market had she been delivered to it in time.

October 25 Barber & Co. offered the libelant 25 shillings per dead weight ton per month for a steamer of similar description. This Gans Line accepted, but when it named the Themis, Barber & Co. refused to take her as not available, she being then on her way to New Zealand. This acceptance was persuasive evidence of what they thought the value of the charter party. December 9 the Gans Line gave up further negotiations with Barber & Co., and charter rates had by that time risen, and were gradually rising. We find that 30 shillings per ton per month would have been a fair market rate for the steamer at and shortly after the last-named date.

Decree modified by reducing damages to 30 shillings per dead weight ton per month, and, as modified, affirmed, with half costs in this court to the appellants.

WARD, Circuit Judge (dissenting in part). I agree with the opinion of the court except as to the allocation of the Gans Line's damages between the owners, the Nova Scotia Company, charterers, and Barber & Co., Inc., subcharterers. My opinion is that the owners only should be held liable.

Imprimis, I lay out of the case two considerations to which great weight is given both by the District Judge and by this court.

The first is the provision contained in the charters and in the sub-charter that; while the master shall sign bills of lading as presented, the charterers will indemnify the owners against "all consequences or liabilities that may arise from the captain so doing." This very familiar clause applies only to claims of shippers under the bills of lading, and no such claim ever arose in this case.

The second consideration is the provision in Barber & Co.'s bills of lading as to transshipment. This was a privilege to the carrier, but both the District Judge and this court hold that it is a privilege which Barber & Co., Inc., were bound to avail of. On the contrary, I think they were not bound to do so if the transshipment would have prejudiced the shipper under the bills of lading, which manifestly was Barber & Co.'s view. The owners and the Nova Scotia Company, charterer, were likewise so bound, because the bills of lading, signed by the master, or by Barber & Co. for the master, were as much theirs as they were Barber & Co.'s.

It seems to me unreasonable to say that Barber & Co. should have discharged the cargo of 11,000 tons of general merchandise accepted by them as common carriers on a concededly proper voyage because the unexpected closure of the Canal made it impossible to redeliver the steamer at the dates fixed in the charters if the voyage were performed, or to say that the failure of Barber & Co. to instruct the master to transship at the island of Santa Lucia in the West Indies or at Durban, South Africa, and not the closing of the Canal, made redelivery on the agreed dates impossible.

It is very significant that this suggestion as to transshipment was made for the first time at the trial. Neither at the time the events happened nor in the pleadings in the cause did these experienced merchants and eminent lawyers make any such claim. No one of the parties interested dreamed of abandoning the Australian voyage, and after it had been performed the libel filed by the Gans Line and the petitions of the owners and of the Nova Scotia Company under the fifty-ninth rule (29 Sup. Ct. xlvi) was not that the voyage around the Cape violated the charter, but that the voyage originally planned, beginning September 12, 1915, via the Canal, violated the charter, because it made redelivery of the steamer at the charter dates impossible. Upon this latter question, however, both the District Judge and this court hold that the original voyage was reasonable and could have been performed in time for redelivery of the steamer to the owners, as agreed.

The question is whether the exception of dangers and accidents in the Canal contained in the charters to Nova Scotia Company and to Barber & Co., Inc., protects them against liability for failure to redeliver the steamer at the agreed dates because of the unexpected closure of the Canal. Of course this exception would not protect either the owners, the Nova Scotia Company, or Barber & Co., Inc., against claims of shippers if the voyage to Australia had not been performed, because manifestly the closure of the Canal would not have prevented per-

formance, but would only have made the time of performance longer. On the other hand, going around the Cape of Good Hope did make it impossible to redeliver the steamer at the agreed date, and, if it was the duty of the owners and of the Nova Scotia Company and of Barber & Co. to perform that voyage, as I think, and they apparently thought it was, then the owners have no claim against Nova Scotia Company or Barber & Co., Inc., for doing so.