### THE IRISTO.

**MIDDLETON & CO., Limited, et al. v. OCEAN DOMINION S. S. CORPORATION.**

**W. M. CROMBIE & CO., Inc., et al. v. SAME.**

**MAWDSLEY et al. v. SAME.**

District Court, S. D. New York.
Oct. 20, 1941.

30

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Ezra G. Benedict Fox, both of New York City, of counsel), for libelants.

Haight, Griffin, Deming & Gardner, of New York City (Wharton Poor and James McKown, Jr., both of New York City, of counsel), for respondents.

CONGER, District Judge.

These are three libels to recover for the loss of the cargo of the Norwegian steamer Iristo, which became a total loss after stranding on the reefs on the northern side of Bermuda on March 15, 1937. The suits are by a large number of consignees and other persons interested in the cargo. The same general issues are involved in each of the libels.

The respondent, Ocean Dominion Steamship Corporation, a New York corporation, was not the owner of the Iristo, nor were her master and crew in its employ. The respondent is sued on the claim that it was the carrier of the merchandise, although it was only the sub-charterer of the ship.

The respondent impleaded as a third party respondent, the Atlantic Maritime Corporation, from which corporation the Ocean Dominion Steamship Corporation had chartered the ship. The Atlantic Maritime Corporation obtained a stay of the petition under the arbitration clause in the charter party. The owner of the Iristo, a Norwegian corporation, from which the Atlantic Maritime Corporation had chartered the ship, is not a party to these actions.

The Iristo was of 1,821 gross tons, and 1,064 net tons. She was built in 1919 by the American Shipbuilding Company, of Lorraine, Ohio. She was 251.2 feet long, 43.7 feet broad and 18.2 feet in depth. She had triple expansion engines, built by the same company. She was classed in the Norwegian Veritas in the highest class, having gone through a classification survey in Norway in the spring of 1936. After sailing from Norway, the Iristo was employed in trading from the United States and Canada and the West Indies.

On October 5, 1936, the Iristo was chartered to the Atlantic Maritime Commission and performed a number of voyages for that company. On February 2, 1937, the Atlantic Maritime Corporation, as time

charterer, sub-chartered the Iristo to Ocean Dominion Steamship Corporation for a period of about six calendar weeks. Both of these charter parties were on the standard time charter form, approved by the New York Produce Exchange. Both forms had the following clause: "25. Nothing herein stated is to be construed as a demise of the steamer to the time charterers. The owners to remain responsible for the navigation of the steamer, insurance, crew, and all other matters, same as when trading for their own account." Each charter party provided that the owners would "maintain her class and keep the steamer in a thoroughly efficient state in hull, machinery and equipment for and during the service."

The Iristo entered into service under the sub-charter to Ocean Dominion Steamship Corporation, at Philadelphia, on March 3, 1937. The master was instructed to proceed to Halifax, N. S., which he did, arriving there on March 8, 1937. At Halifax, general cargo was loaded in the holds of the ship, and on March 9th she sailed from Halifax for St. John, N. B. She arrived at St. John on March 10th, loaded additional cargo and sailed from St. John on March 11th, bound for Bermuda, her first port of call. At 3 P. M., on March 15th, shortly after passing North Rock Beacon, she struck an under-water reef, off the northwest coast of Bermuda. Some hours later, in the early morning of March 16th, while being towed towards the Narrows, at Bermuda, the Iristo sank, and her cargo, with insignificant exceptions, became a total loss.

The issues presented to this Court are as follows:

(1) Is respondent, Ocean Dominion Steamship Corporation, liable as carrier or otherwise under the bills of lading?

(2) Was the Iristo seaworthy or unseaworthy when she sailed from Halifax and St. John, for a voyage to Bermuda and the West Indies?

(3) If the Iristo was unseaworthy, had due diligence been exercised to make her seaworthy?

(4) If the Iristo was unseaworthy, and/or due diligence to make her so had not been exercised, did the stranding and subsequent loss of the vessel result in whole or in part from her unseaworthiness?

Counsel for both parties, at the opening of the trial, agreed that if the respondent was not the carrier, and is not liable on the contract, "that is the end of the case."

Both of the time charterparties herein were on the same form. As already pointed out, nothing in the charterparties was to be construed as a demise, and the owners were to be responsible for the navigation of the ship. The charters further provided that: "The Captain (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment or agency; and Charterers are to load, stow and trim the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts." The master of the Iristo specifically authorized the respondent, Ocean Dominion Steamship Corporation, in writing, to sign bills of lading for him.

The general rule applicable when the carrying ship is under charter is stated in Scrutton on Charterparties and Bills of Lading, 14th Ed., at pages 2 and 3:

"The charterer with whom the shipowner enters into the contract of affreightment may intend to supply the cargo himself. In this case, when the cargo is shipped, a bill of lading will generally be signed. Such a bill of lading, while in the hands of the charterer, is usually merely a receipt for the goods, but may be evidence of a contract adding to or varying the contract between them contained in the charterparty.

"Or the charterer may intend to enter into sub-contracts of carriage with other shippers, who provide all or part of the cargo. In this case, as each shipper ships his goods, a bill of lading will be signed, evidencing a contract between the shipper on the one hand, and, according to circumstances, the shipowner or more rarely, the charterer on the other. Such contract will be independent of the contract contained in the charterparty, except in so far as it expressly incorporates it."

This case comes within the second paragraph of the above quotation, that a bill of lading will evidence a contract between the shipper and the shipowner or the charterer.

It, therefore, is incumbent upon this Court to examine the bills of lading issued herein, and determine whether they are contracts of carriage between the shippers and the owners of the Iristo, who are not parties to this action; or a contract of

carriage between the shippers and the sub-charterers, the respondents herein.

There are two types of bills of lading herein, the so-called port bills of lading, and the through bills of lading, some of which contain clauses incorporating the port bills of lading by reference. I will consider the port bills of lading first.

Of the port bills of lading, 196 were issued. There were four separate prints of these 196 bills of lading: 2 on a print of 1931, 9 on a print of 1933, 27 on a print of 1934, and 158 on a print of 1936.

The prints of 1931, 1933 and 1934 were signed: "Ocean Dominion Steamship Corporation, For Master and Owners, By ......." The actual signature was either that of one of respondent's agents at Halifax or St. John, or that of one "J. P. Brown", respondent's employee. The 1936 print was signed: "Ocean Dominion Steamship Corporation, By authority of the Master and/or owners of the above mentioned steamer, By ......" The actual signature was filled in just as on the earlier prints.

The practice was for the shippers to obtain blank bills of lading forms and fill them out with the particulars of the goods, the port of destination, etc., and then present them for signature to the respondent or its agents when the goods were delivered to the ship. All of the shippers had shipped pursuant to this arrangement for a long time previous to the instant voyage.

■■ The question whether the respondent, by signing the bills of lading as aforesaid, bound itself as a carrier, or merely signed as agent for the owner, by authority of the master, must be determined according to the Canadian law. Both sides produced Canadian attorneys, who testified upon this question, and the question of the foreign law has been raised. See Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 445, 9 S.Ct. 469, 32 L. Ed. 788.

Neither Canadian attorney, called as experts on Canadian law by each party, was able to produce any decisions upon this issue from the courts of Nova Scotia and New Brunswick, which decisions would be of binding force herein. The decisions cited by the Canadian counsel are those of the House of Lords, the English Court of Appeal and various English courts of first instance.

In view of the lack of decisions, or statutory law, in Canada on this issue, the libelants have cited certain decisions of courts of the United States. Benner Line v. Pendleton, 2 Cir., 217 F. 497; Id., 246 U. S. 353, 38 S.Ct. 330, 62 L.Ed. 770; The Themis, 2 Cir., 275 F. 254, certiorari denied 257 F. 655, 42 S.Ct. 97, 66 L.Ed. 419; The Poznan, D.C., 276 F. 418. Cf. The Arnold Maersk, 1924 A.M.C. 671 (cited by respondent). However, I am not relying upon any of these cases for my decision herein. Irrespective of what the American law is on this subject, the parties hereto have presented this question to be decided upon Canadian law, as they would any other issue of fact, and neither Canadian counsel, libelants' nor respondent's, have advanced the theory that this cause must be decided under American law because of the lack of Canadian law on the precise question. On the contrary, both parties have cited and quoted many English decisions, which are controlling and/or persuasive upon Canadian courts. I shall follow these English cases.

■ The prints of 1931, 1933 and 1934 contain the words "For Master and Owners". This indicates that the respondent signed as agent of the Master and/or owners of the vessel. The word "for" generally denotes an agency. See 26 Corpus Juris 791. In fact, this precise question was decided in Kimber Coal Company, Ltd., v. Stone & Rolfe, L.R., 1926 A.C. 414. In that case the signature on a charterparty read: "For the Atlantic Baltic Co., Copenhagen, J. B. Jamison, of the Kimber Coal Company, Limited." It was held that the word "for" meant that the principal was the "Atlantic Baltic Company, Copenhagen", and that the Kimber Coal Company could not be held liable under the charterparty. See discussion in Universal Steam Navigation Co., Ltd., v. James McKelvie & Co., L.R., 1923 A.C. 492, which specifically overruled Lennard v. Robinson, 5 E. & B. 125; also Gadd v. Houghton, 1 Exch.Div. 357, 360.

■ The 1936 prints were signed "By authority of the Master and/or Owners of the above-mentioned steamer". The very language of this signature clearly indicates that the respondent signed, not as principal, but as agent of the master and/or owner by express authority to so sign.

The case of Wilston Steamship Co., Ltd., v. Andrew Weir & Co., 1925, 31 Com.

Cas. 111, is enlightening on this point. In that case Andrew Weir & Co. had a time charter from the Wilston Steamship Co., Ltd. A large number of bales of cloth and jute which had been loaded aboard the vessel were not delivered, and the consignees made claim upon the time charterer, who paid the claims, and then sought the amount so paid from the shipowners. The owners denied liability, alleging that the bills of lading in question did not constitute any contract between the shipper and the charterers, but between the shippers and the vessel owners. Their defense was that the charterers were mere volunteers in paying the claims. The court agreed with the shipowners, stating: "* * * the really decisive language, in my opinion, is to be found at the end of the document. The words are as follows: 'In witness whereof the master or agent of the said ship has signed three bills of lading exclusive of the master's copy, all of this tenor and date, one of which being accomplished the others are void'. Then comes the words 'for master' in print, and then the writing 'for Captain A. Souter, master ss. Wilston, for Turner, Morrison & Co. Ltd.', and follow initials which look like J. N. or J. W." After stating that the person affixing the initials "J. N. or J. W." had signed for Turner, Morrison and Co., Ltd., the court continued: "In these circumstances I agree with the decision of the arbitrator that this bill of lading was a bill of lading contract of the shipowners. The facts seem to bring the case on that side of the line on which we find the decision in Wehner and others v. Dene Steam Shipping Company (1905) 2 K.B. 92, 10 Com.Cas. 139, and the decisions of the three courts in Tillmanns v. Knutsford, (1908) 1 K.B. 185, (1908) 2 K.B. 385, 1908 A.C. 406, 13 Com.Cas. 334 * * *."

As is stated in Carver on Carriage by Sea, Sec. 156, 8th Ed., pp. 250, 251:

"In effect then, the contract is in general with the shipowner; and the master should be regarded as having made it on his behalf, and not on behalf of the charterer. And this is the more consistent view. For if the master is agent for the charterer in giving the bills of lading, his agency ceases at that point; in carrying out the contract he clearly acts as servant of the owner.

"Moreover, this view is not inconsistent with the terms of those charters which expressly stipulate that the master shall sign bills of lading as required by the charterer. Such a charter-party provides that the owner shall give the use of his ship to the charterer; and one agreed manner of doing this is, that the goods of third persons shall be carried, for the charterer's profit, if any can be got, under bills of lading to be signed by the master.

"* * * The meaning, then, of the stipulation that the master shall sign bills of lading seems to be that the shipowners shall, through the master, contract with shippers for the charterer's benefit; and not that the master shall do so as agent for the charterer. The master signs 'not exactly as agent of the charterer, but because he is bound to sign by reason of the charter-party.'"

And in Sec. 157 of the same authority, p. 252, it is stated: "If the above is the true view, it follows that when the bill of lading is in the hands of the shipper, or indorsee, who is a stranger to the charterparty, the contract shown by it is one between him and the shipowner; and may be enforced by and against the shipowner accordingly."

See also Wehner v. Dene Steam Shipping Co., 1905, 2 K.B. 92; Tillmanns & Co. v. SS Knutsford, 1908, 1 K.B. 185, 2 K.B. 385, 1908 A.C. 406; Nederlandsche Handelsmaalschappij v. Shalhlorne Steamship Co., 25 Ll. L.L.R. 111, affirmed 39 Ll.L.L. R. 171.

The libelants contend that the bills of lading herein evidence a contract between the respondent (charterer) and the shipper. To support their view, under the English common law, they have cited several cases which cannot be considered controlling because the charterparty in each of these cases was a demise, or considered by the court as a demise. Colvin v. Newbury, 6 Eng.Reprints 923; Herman v. Royal Exchange Shipping Co., 1 Cab. & El. 413. Another English case cited by libelants, Marquant v. Banner, 119 Eng.Reprints 850, is not considered good law in England, and has been criticized in several other cases. See cases cited in Scrutton on Charterparties and Bills of Lading, 14th Ed., p. 434, note (t); Carver on Carriage by Sea, 8th Ed., Sec. 155.

[6] The libelants have stressed the holding of several English cases that the documents and circumstances in each case should govern in determining whose contract is the bill of lading. See Samuel v. West Hartlepool Steam. Nav. Co., 11 Com. Cases 115, 125; Steamship Calcutta Co.

Ltd. v. Andrew Weir & Co., 1 K.B. 759, 768; Adams v. Hall, 3 Asp. M.C. 496, 499. With this doctrine there can be little dispute. However, in many instances, an agent signs as an apparent principal, and hence may be liable on the contract. The English courts have used this principle, and under the facts in each case have held the charterer liable when the charterer has signed the bill of lading or the charterparty as the apparent principal. See The Okehampton, 1913 Prob. 173; Paterson Zochones & Co. v. Elder Dempster & Co., 1923, 1 K.B. 420, reversed on other grounds, 1924 A.C. 523. In Brandt v. Morris, 1927, 2 K.B. 784, it was held that where one signed "for and on behalf of * * *", the reference to the other party was to indicate the destination of the merchandise required by statute, and that the signature therefor was the unqualified signature of the owner. Since the signature in this case was compulsory by statute, the holding therein is not controlling upon the situation at bar.

Under the circumstances of the instant case, I believe the bills of lading to be a contract of carriage between the shipper and the shipowner, and not a contract of carriage by the charterer, respondent herein. The practice was evidently one of long standing for the respondents to send out blank bills of lading to many shippers. It would advertise that a certain ship would sail at a certain time. It must have been common knowledge that respondent did not own any ships of its own; that it chartered ships when and if needed. If a shipper had goods for transport to a port of call of the ship chartered, he would fill out the blank bill of lading, and send his goods to the ship to be loaded. The practice seems a haphazard manner of conducting such a large business, in that there is doubt as to the contracting parties, but under the circumstances, I cannot avoid the fact that the respondent, in signing the bills of lading for the master and owners, actually signed as an agent and not as a principal.

■ The 1934 and 1936 prints contained a clause (Four) which read: "As the Goods are carried upon a vessel not owned by, but under charter to Ocean Dominion Steamship Corporation, the Ocean Dominion Steamship Corporation shall not be liable for any loss or damage which may be sustained by said Goods from the time of their shipment upon said vessel until their discharge therefrom, and the shippers, consignees and other persons interested in said

Goods hereby agree to make and enforce all such claims, whether or not based upon breach of warranty of unseaworthiness, solely against the carrying vessel and/or her owners, and hereby release Ocean Dominion Steamship Corporation from all liability or responsibility with respect to such claims." The libelant's expert on Canadian law testified that, in his opinion, the respondent herein was a carrier, and that therefore this clause was void under the Canadian Water Carriage of Goods Act. The respondent's expert witness, on the other hand, conceded that this clause would be void under the Canadian Act if respondent was a carrier, but, in his opinion, this clause merely sets out the relationship of the parties, and is not an attempt to limit respondent's liability as a carrier. This witness was of the opinion that respondent was not a carrier, and that therefore this clause is not void under the Act. I am in accord with this latter view as I believe this clause sets forth the contractual relationship of the parties; hence the port bills of lading are not to be regarded as evidencing a contract between the shipper and Ocean Dominion Steamship Corporation.

■ The libelants do not deny the fact that the owners of the Iristo are liable herein, but they contend that the time-charterer, respondent, is liable as well; that the bills of lading are such type of contract that both charterer and vessel owner are liable. With this contention, I cannot agree. The mere fact that the contract was signed by respondent as agent for the shipowner, together with Clause Four (quoted hereinbefore) of the bill of lading, which stated that the respondent was charterer of the ship and not liable for damages to goods when aboard the vessel, indicates that the contract was between the shipper and the owner alone.

There were 44 shipments loaded on the Iristo at Halifax under through bills of lading, issued by various steamship companies, and 22 shipments to be transported under through bills of lading issued by Canadian railroads. Neither the respondent, nor the shipowner, issued any of its own bills of lading for these shipments.

All of the through bills of lading issued by the Canadian railroads incorporated the Canadian Water Carriage of Goods Act, which relieved a carrier if the loss was due to negligence in navigation or management, provided, of course, that a seaworthy ship

was furnished and/or due diligence was exercised by the owner and/or carrier to make the ship seaworthy.

The steamship bills of lading issued by the Shaw Steamship Company incorporated the Canadian Water Carriage of Goods Act, and others incorporated the English Carriage of Goods by Sea Act. All of the steamship through bills of lading issued also provided that "the property covered * * * is subject to all the conditions expressed in local bills of lading used by the steamship or steamship companies carrying this property at the time of shipment."

The railroad through bills of lading of Canadian Pacific Railroad and the Dominion Atlantic Railroad, and the steamship through bills of lading issued by the Furness Red Cross Lines, and the Furness Lines, further provided that no carrier shall be liable for loss, damage, injury or delay not occurring while the goods are in its custody.

■ In Scrutton on Charterparties and Bills of Lading, 14th Ed., p. 199, it is stated: "Where goods are to be carried under a through bill of lading, separate bills of lading are sometimes signed for the conveyance of goods on subsequent stages of the transit. In these bills of lading the company, or the shipowner signing the through bills of lading, appears as the shipper, and there is indorsed on the bills 'Delivery to be made to the holders of the original bill of lading duly indorsed, per s.s. S, from X, dated. * * *' This is done to prevent conflicting claims to the goods from two sets of bills of lading for the same goods being in circulation. There is also very commonly a reference in a through bill of lading and incorporation of the terms of the regular bills of lading in use by the steamship company carrying the goods. (As to this see quotation from same authority, supra). In this case no bills of lading for the sea carriage is issued or signed; the regular form is merely referred to." In the instant case, it will be noted that there was not produced before me the usual bill of lading of the owner of the Iristo; what the usual bill of lading of the owner is, I do not know; but, if the respondent's bill of lading is considered, the exceptions and defenses of its usual bill of lading are incorporated by reference, even though no such bill of lading was actually issued by the respondent. Therefore respondent's defenses to the port bills of lading considered herein-

above are equally effective to these through bills of lading.

■ In any event, in those bills of lading which stated that claims are to be made "only against the carrier or contractor in whose custody or control the goods were at the time of such loss or damage or delay occurred", the respondent cannot be liable, for the loss of the goods herein occurred when the goods were in the custody or control of the owner of the Iristo, and claims must be made against that owner, and not against respondent, since I have hereinabove held that respondent is not a carrier.

■ As to those other bills of lading which did not contain the above clause, as well as to those that do, assuming the respondent the carrier, on all the bills of lading, through and port, I am of the opinion that the libelants must fail in this action, for the Iristo was seaworthy, and at least due diligence was exercised to make her so.

The Iristo sailed from St. John on March 11, 1937, about 4:30 P.M. On the trip to Bermuda normal weather conditions were experienced and nothing unusual happened prior to the stranding. On March 15th, at noon, the position of the ship was taken, with a course directed to pass about three miles North of North Rock Beacon. When the North Rock Beacon was sighted, the master directed a four point bearing to be taken to ascertain the distance of the vessel from this light.

Under water reefs run for some miles to the eastward of this light, which is approximately 9 to 10 miles from the island, Bermuda. The second mate, in taking the four point bearing, ascertained the distance from the light as 2 miles off, but he was so sure that the beacon was not that far, he assumed the distance of 1½ miles as correct. The ship was abeam of the light at 2:50 P.M. The weather at this point was rainy with some fog at times and the visibility was limited.

As the Iristo passed North Rock Beacon, there appeared on her starboard bow a steamer, which the crew of the Iristo thought was drawing closer. The master and the second mate, thinking they were approaching a large passenger steamer, altered the course of the Iristo to starboard, so as to pass this vessel port to port, in accordance with the general rule of the sea. A few minutes later, at about 3 P.M., the Iristo ran onto the reef. The steamer sight-

ed by the Iristo was in fact the Cristobal Colon, wrecked on the reefs late in October, 1936.

The port and through bills of lading, by which the cargo, originating in Canada, was carried on the Iristo incorporated the Canadian Water Carriage of Goods Act; and that cargo carried on through bills of lading from English ports, incorporated the English Carriage of Goods By Sea Act; but both parties agree that the within case is to be governed by the Canadian Act together with its annexed Rules.

 Under the Canadian Water Carriage of Goods Act and its annexed rules, the burden of proving unseaworthiness is upon the cargo libelants, and if unseaworthiness is shown, the burden is then cast upon the shipowner or carrier, if it wishes to escape liability, to go on with the evidence and show that due diligence was used to make the ship seaworthy. Under the Canadian statute, due diligence is not made a proviso of any of the exceptions, but is to be considered separably therefrom. The Aakre, D.C., 31 F.Supp. 8, affirmed 2 Cir., July 28, 1941, 122 F.2d 469.

The cargo libelants herein allege that the Iristo was unseaworthy (1) because of the inadequacy of her navigational data, in that the Iristo was not equipped with proper Sailing Directions; (2) because the Chart #360 (British Admiralty) was insufficient for safe navigation to Bermuda due to its small scale; (3) because information concerning the existence and position of the wreck of the Cristobal Colon was not readily available.

 The vessel's officers had never before sailed to Bermuda; this was their first venture into these waters.

There is some conflict in the testimony herein as to whether or not there were any Sailing Directions on board the Iristo when on this particular voyage. On the trial the members of the crew, questioned by counsel for both parties, indicated that Sailing Directions for Bermuda were aboard the vessel, although libelants introduced ex parte statements by various officers who were questioned in Bermuda immediately after the stranding, in which some of their testimony at the trial appears contradictory. I am of the opinion, however, that some type of Sailing Directions were aboard the Iristo, although which type, I cannot ascertain from the testimony. It should be noted, however, that none of the Sailing Directions made any mention of the wreck Cristobal Colon.

Irrespective of whether or not there were Sailing Directions aboard the Iristo, it is of little importance as to her seaworthiness. All of the elements which the crew of the Iristo might obtain from the Sailing Directions were shown and contained on the chart which they used. There appears to be nothing unusual or hazardous in sailing to Bermuda without such Sailing Directions, when the ship was equipped with a chart which showed the reefs thereinabout.

The libelants have made much of the fact that, without the guide of the Sailing Directions, the Iristo was on a wrong course in approaching Bermuda from the North. They insist that the Iristo was headed for North Rock Beacon as first landfall, although the testimony appears to be contradictory, in that the Master of the Iristo claims he was headed for North East Breaker buoy as first landfall, a considerable distance to the eastward. In any event, whether headed for one or the other, in daytime, it does not seem to make any difference. From the chart aboard the vessel, it can be ascertained very readily that there is a coral reef in and near these places, and a ship approaching from the North has to alter course to the eastward and proceed around the reef to approach the island and secure a pilot to enter the harbor. Therefore, it seems to me to be unimportant whether or not Sailing Directions were abroad the Iristo, and that the Iristo was seaworthy insofar as this was concerned. Cf. Savannah Sugar Refining Corp. v. Atlantic Towing Co., 5 Cir., 15 F. 2d 648.

 The only chart aboard the Iristo relating to Bermuda on this voyage was a British Admiralty Chart #360, of a scale 1/200,000. The libelants contend that the small scale of this chart, without relation to the wreck of the Cristobal Colon, renders the ship unseaworthy. Experts for the libelants so contended at the trial, while respondent's experts on this phase of the case contended that this chart was of sufficiently large scale to permit safe navigation to a point off St. David's Head where a pilot could be picked up.

When the Iristo was at Halifax, the master attempted to buy charts for his trip to Bermuda. There are three charts published by the British Admiralty for the Bermuda Islands: (1) No. 360, a chart of

the whole Bermuda Islands on the scale of 1 to 200,000; (2) Nos. 334 and 335, one covering the western and the other the eastern sections of Bermuda, on a scale of 1 to 35,320. The master applied to J. M. Gabriel, agent for the sale of British Admiralty charts, and the only one actively engaged in this business at Halifax. The only charts available from Mr. Gabriel was a stock chart #360 and chart #334, but no chart #335. The chart #360 available at Halifax showed the printed symbol to indicate the wreck Cristobal Colon, but because the #335 was not available, the master decided to wait until he reached St. John to buy his charts. When he arrived at St. John, there also was a temporary shortage of chart #335, so the Master bought a chart #360, with the latest correction that of Notice to Mariners No. 462 of 1932. This chart did not contain a notation of the wreck off Bermuda.

It should be noted that when the Iristo was at Boston, on February 13, 1937, the master called at the United States Hydrographic Office and obtained a number of Notices to Mariners, which he examined carefully, and placed in a drawer in the chart room, the customary place for keeping them. On March 3, 1937, when he was in Philadelphia, he obtained more Notices to Mariners from the United States Hydrographic Office. He glanced through these and put them in his private dining saloon, although this was not the customary place for them. Both these sets of Notices to Mariners contained the notation of the wreck Cristobal Colon off Bermuda, but because the Master did not know at that time that he was to ship to Bermuda, he paid no particular attention to the wreck Cristobal Colon. It was not until he arrived at Halifax, sometime thereafter, that he knew he was to proceed to Bermuda. Consequently he did not correct his chart purchased at St. John with the latest correction as noted in the Notices to Mariners. He chose to rely upon his chart, although it was not up to date.

I believe the chart #360 to be sufficient for navigation in and around Bermuda. The testimony is that the Iristo was headed for North Rock, and the crew of the vessel laid a course on this chart #360 to be well clear of North Rock. Once having identified North Rock Beacon, as they did, it was only necessary to keep a safe distance away from the reef until St. David's Island light was sighted, and then proceed some nine miles southeast to the pilot station at the Narrows.

The dangers in and around this reef, and in and around the Bermuda Island, are well depicted on this chart. True there are charts of larger scale, on which there are many more details, but all the usual dangers, such as the existence of the reef, the depth of the water, etc., are shown on this smaller scale chart. The situation did not require the navigational skill necessary for proceeding into the Narrows at Bermuda, for the master had no intention for doing that with this chart, but intended to employ a pilot. The ship had a chart reasonably sufficient for her safe navigation.

The libelants also contend that the Iristo was unseaworthy because information concerning the existence and position of the wreck Cristobal Colon was not readily available. None of the officers of the Iristo knew of the existence of this wreck, and the chart #360 which they were using contained no information concerning the existence of this wreck. However, as pointed out above, when the master was in Boston and in Philadelphia, the Notice to Mariners #52 of 1936, which sets out the position of the wreck, was aboard the vessel, and at least one set of such notices was available for study, although apparently no member of the crew so studied them. Had the master been cautious and careful, as he should have been, he would have taken the chart and corrected it to date, by going over the Notices to Mariners which were on the vessel and available. He would then have had knowledge of the existence of the wreck Cristobal Colon and its location, which he should then have indicated on his chart. There was plenty of time to do this before he arrived in the vicinity of Bermuda. This apparent negligence on the part of the officers of the ship cannot be attributable to the carriers herein. The available material was on the vessel, although not used. Whether the officers were so incompetent as to render the ship unseaworthy, I cannot say, but I do believe that the owners and/or carrier used due diligence in their selection of personnel for the officers and crew.

The master, 51 years of age, went to sea first in 1901. In due course, he worked up through the grades and became a chief officer in 1912 or 1913, and a master in

1915. He had received a master's license from the Norwegian government for unlimited trading, and since 1915 had traded all over the world. The first mate went to sea in 1913, and obtained a master's license in 1926. The second mate went to sea in 1921, and obtained his mate's license in 1929. All three were of wide sea experience. It was stipulated that the managing owner of the Iristo, if called, would testify that he had made inquiry as to their abilities before hiring them as officers, and had found their records satisfactory. In fact, the officers appear to be competent men, dispite their negligence which caused the stranding.

Numerous cases are cited by the parties hereto, from which I was able to ascertain how other judges, both American and English, have ascertained the true meaning of that vague term: "unseaworthy". I have not quoted, nor cited, any of these cases, as I do not believe it necessary in determining this question of fact.

The loss herein was due to an "act, neglect or default" in navigation or management of the ship, for which there is no liability under Art. IV, 2 (a) of the Rules annexed to the Canadian Water Carriage of Goods Act.

Finding as I do, it is not necessary for me to decide whether, if unseaworthiness had been proved, then this unseaworthiness was the proximate cause of the stranding; although in the summary (infra) my conclusion as to this is given.

In summary, then, I do not think the respondent liable herein as a carrier. Even assuming that it is a carrier, I do not think the Iristo was unseaworthy, although in any event, due diligence was exercised by the owners and/or carrier to make her seaworthy. However, assuming that the Iristo was unseaworthy, as to the small scale of her chart, and/or the lack of Sailing Directions, I do not think this unseaworthiness the proximate cause of the loss; but assuming the unseaworthiness to be the lack of availability of the information of the existence and position of the wreck Cristobal Colon, then this unseaworthiness is the proximate cause of the stranding.

Under these circumstances, I think the libels should be dismissed, and a decree entered granting judgment to the respondent. If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, then submit such findings and conclusions on notice herein. Counter-findings should not be submitted, as I would prefer criticisms of the proposed findings.