## SAVANNAH SUGAR REFINING CORPORATION et al. v. ATLANTIC TOWING CO. et al.

(Circuit Court of Appeals, Fifth Circuit. October 23, 1926.)

No. 4887.

**1. Evidence ⬅265(2).**

Tax returns *held* unsatisfactory evidence, and insufficient to show overvaluation of tugs rendering salvage services.

**2. Salvage ⬅26.**

Actual values of property saved and of the instrumentalities used are proper to be considered in fixing amount of salvage award.

**3. Salvage ⬅21.**

Salvors of stranded vessel *held* not chargeable with fault in failing to at once bring wrecking anchor to scene of stranding, in view of their limited information and delay incident to such course.

**4. Salvage ⬅30.**

Salvage award of $15,000 and interest for services rendered stranded vessel valued at $100,000, carrying freight and cargo valued at over $300,000, by tugs valued at $250,000, *held* not excessive.

**5. Salvage ⬅37.**

Stranding of vessel *held* due to failure of master to make proper use of information available to him, rather than to owner's failure to provide proper chart as affecting liability of cargo for salvage services.

Appeal from the District Court of the United States for the Southern District of Georgia; William H. Barrett, Judge.

Libel by the Atlantic Towing Company and others against the steamship Silverway and her cargo, for salvage services. From a decree for libelants (14 F.[2d] 154), the

Savannah Sugar Refining Corporation, claimant of the cargo, and others, appeal. Affirmed.

Geo. T. Cann, Robert M. Hitch, and A. B. Lovett, all of Savannah, Ga., and John M. Woolsey, of New York City, for appellants.

T. M. Cunningham, Jr., and Walter C. Hartridge, both of Savannah, Ga., and Earl Farwell and James K. Symmers, both of New York City, for appellees.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

WALKER, Circuit Judge. The steamship Silverway and her cargo of sugar were libeled for alleged salvage services rendered. The court, by its decree entered June 3, 1926, awarded to libelants $16,850 for salvage services rendered to the Silverway, her cargo, and pending freight, and prorated that amount according to salved values found, with the result that the sum of $4,653 was adjudged against the claimant of the Silverway and its surety, and the sum of $12,197 was adjudged against the claimant of the cargo and its surety, with interest on those sums from the date of the decree. The claimant of the cargo and its surety appealed from the decree, which is complained of on the grounds: (1) That the amount awarded was excessive; and (2) that the court erred in holding that the cargo was primarily liable for any part of the amount properly allowable as salvage.

After the libel was filed, and after the steamship and the cargo had been released upon the giving of bonds, with surety, by the respective claimants thereof, the cargo owner filed a petition which prayed that the owner of the Silverway and its charterer be made parties, and that the amount of any salvage awards to which the libelants might be found to be entitled be decreed to be paid in the first instance by the Silverway and her charterer. That petition asserted the claim that the Silverway was unseaworthy by reason of not being equipped with adequate charts and sailing directions on her voyage from Cuba to Savannah, which was in progress when she stranded, that the stranding of the Silverway was due to such unseaworthiness, and that such unseaworthiness was a violation of the contract of affreightment under which the cargo was accepted and carried. There was no service of process under that petition, and the parties so sought to be brought in did not appear or respond to it.

The following statements contained in an opinion rendered by the District Judge are supported by the record:

"On the afternoon of June 29, 1924, at 5:50 p. m., at about high water, the steamship Silverway, bound from Cuban port to Savannah with a cargo of raw sugar, went aground on the shoals off the north end of Warsaw Island. The ship was going at full speed ahead and ran hard aground. The captain of the Silverway sent this wireless to the Savannah Sugar Refinery Corporation: 'Want immediate assistance Vessel aground Making no water. Tybee Island Light bearing N. 14 E. eleven miles.'

"Knowledge of this was first brought to the captain of the Atlantic Towing Company by a boy who had received it over radio, and thereafter he was advised of it by Mr. Robertson, of the Savannah Refining Corporation, about 8:30 o'clock in the evening. The pilot boat Christabel arrived at the scene of the stranding at 11 p. m., June 29th. The tugs Cynthia and Henry W. Grady began preparation at Savannah, about 30 miles from the Silverway, at 8:30 p. m., and arrived at the scene of the stranding at 3 a. m. on June 30th. The pilot boat and these two tugs attempted to pull off the Silverway on the morning tide of June 30th. The tug Jacob Paulsen left Jenkins Island at 1:25 p. m. June 30th, and arrived at scene of stranding at 4:15 p. m. Those three tugs pulled on the Silverway the afternoon of June 30th; the Christabel not being present. The tug Wm. F. McAuley was notified on June 30th to come from Georgetown, and arrived at the ship at 3 a. m. on July 1st, went to Savannah, and brought back a 4,000-pound anchor and 200 fathoms of hawser, and arrived at the Silverway at 12:30 p. m. July 1st. On the morning tide of July 1st, the Christabel, Cynthia, Grady, and Paulsen pulled on the steamer. On the afternoon tide of July 1st, the Christabel, Cynthia, Grady, Paulsen, and McCauley pulled on the vessel, aided by the wrecking anchor, thereby succeeding in putting the Silverway afloat in about 15 minutes. The Cynthia supplied the steamship with fresh water necessary in working her engines. The value of the vessels engaged in the pulling and the supplying of water was approximately $250,000; 281 bags of sugar were lightered before the vessel was finally floated. The weather was warm and on the whole free from storms or menace thereof, though there was a slight brief blow. The Silverway was, at low water, aground substantially throughout its length, more deeply imbedded at the bow than at the stern. There was no loss to cargo. The service was strictly a salvage service, as no recovery for the service could be

had, unless success should be attained. There were 46 men engaged in the salvage, outside of the crew of the Silverway. The Silverway was valued at $100,000, the freight at $10,-826.64, and the cargo at $290,537. * * * There was some risk of injury to the ship being permanently disabled, if it had become firmly imbedded in the sand."

The ship sustained no damage, except from a slight injury to her engines, due to sucking in sand while she was aground. Two hawsers supplied by tugs engaged in the service broke during the pulling operations, and new hawsers were supplied and used. There was evidence as to the loss resulting from the injury to the hawsers, but there was no finding as to the value of those hawsers, or of those which were furnished and used in their place, and no finding as to the value of the wrecking anchor which was furnished and used. There was no contract to pay the libelant for the services rendered.

[1, 2] The court's valuation of the tugs which took part in the services rendered is criticized. Testimony of witnesses, one of whom was disinterested so far as appears, fully supported that finding of the court. That testimony was not sought to be rebutted, otherwise than by evidence that in returns for taxes for the years 1922, 1923, and 1924—the one for the year 1922 having been made and sworn to by one of the witnesses who testified as to the value of the tugs—the tugs were valued at considerably less than the valuations deposed to by the witnesses. Evidence showed that undervaluation of property in returns of it for taxation was common in Georgia. It is generally so common as to make such returns quite unsatisfactory evidence of the actual value of property mentioned therein. The property values properly considered in fixing the amount of a salvage award are the actual values of the property saved and of the instrumentalities used in effecting the saving. We do not think that the record justifies the criticism under consideration.

[3] It was contended that some of the salvors were chargeable with fault for the failure to send a wrecking anchor on one of the tugs which left Savannah during the night following the stranding, and that the salving operations were unduly prolonged in consequence of that failure. When those tugs left Savannah, no one there had any information of the stranding, except such as was furnished by the above set out radio message. That message gave no indication as to the nature of the stranding, nor as to what assistance would be required to get the vessel

afloat. Evidence showed that that anchor weighed about 4,000 pounds, that it would take three hours, or a longer time at night, to rig it on a tug's bow, and get it properly lashed in position to be dropped overboard at sea, and that, if the tugs had waited until the anchor could have been taken along, they would not have got to the scene of the stranding in time to attempt to get the vessel afloat during the morning high tide of June 30th. There was no suggestion by any one of the need of the aid of a wrecking anchor until after the pulling by three tugs during the evening tide of June 30th, when there was a foot more water than during the morning tide of that day, failed to get the vessel afloat. It is by no means clear from the evidence that, without the loosening of the stern of the Silverway, as the result of the previous pullings and the removal of part of her cargo, the final combined operations of the four tugs, the pilot boat, and the wrecking anchor would have resulted in getting the ship afloat. We do not think that the record justifies the contention under consideration. Of other criticisms of the conduct of the salvors it is enough to say that they are so lacking in merit that discussion of them is not called for.

[4] The place of the stranding was near and like that of the stranding which was in question in the case of The Craster Hall, 213 F. 436, 130 C. C. A. 72. What was said in the opinion in that case is referred to as sufficiently indicating the very great and imminent danger in which the Silverway and her cargo were involved by the stranding from which they were rescued. It is not fairly open to question that the salvage services rendered were meritorious. It is to be inferred that the amount awarded was $15,000, with interest on that sum from the time the salvors became entitled to be paid for their services to the date of the decree. In view of the value of the property saved and of that of the instrumentalities employed in the rescue, and of the other attending circumstances proper to be considered in fixing the amount of a salvage award, we do not think that the amount of the award fixed by the trial court is properly subject to be reduced by this court on the ground that it was excessive.

The contention of the appellants that the court erred in charging against the vessel and pending freight only part of the amount awarded was resisted on the grounds (1) that the evidence did not warrant a finding that the stranding was due to the unseaworthiness of the vessel; and (2) that in the

absence of service of process on a pleading asserting the claim that, because of the vessel's unseaworthiness, the vessel and freight were primarily liable, the issue sought to be raised by the assertion of that claim, was not properly before the court for decision. Unless the evidence showed that the stranding was due to the charged unseaworthiness of the vessel, the question whether, in the above-indicated state of the pleadings, the court, because of such unseaworthiness, properly could have adjudged that the ship was primarily liable for the entire amount awarded as salvage, is not presented for decision.

[5] The claim that the vessel was unseaworthy is based on evidence showing that she was not supplied with United States government charts of waters through which a vessel would pass in approaching the mouth of the Savannah river on a voyage from Cuba to Savannah, or with the publication called "United States Coast Pilot, Atlantic Coast, Section D," which contains sailing directions for the navigation of vessels approaching Savannah. .The evidence showed that the Silverway was supplied with a chart of the "North Atlantic Ocean, Western Portion," by which the master was navigating. That chart indicated the existence of shoals near the coast for a considerable distance south of the mouth of the Savannah river, and that all of those shoals were between the shore and the line of the indicated soundings showing a depth of 6 fathoms. That chart was enough to inform a navigator that in approaching the mouth of the Savannah river from the south the shoals along the coast can be avoided by not approaching the shore nearer than where the water has a depth of 6 fathoms or more.

For several hours before the time of the stranding the Silverway was proceeding in sight of the coast, the day being clear. The testimony of the master showed that by taking soundings he could have been kept informed as to whether the vessel was in water having a depth of 6 fathoms or more, that no soundings were taken before the vessel went aground, and that he would have changed her course to the eastward, if he had taken a sounding within a half hour before the stranding and had found that the vessel was in less than 6 fathoms of water. The evidence showed that there was shallow water for a considerable distance seaward from the place of the stranding, which the testimony of the master showed was about 3½ miles from shore; other testimony being to the effect that the distance from shore was considerably less. Soundings taken a few minutes after the stranding occurred showed that the water was 17 feet at the forward end of the vessel and 18 feet at her stern; her draft being 18 feet forward and 19 feet aft. The master had at hand the means of knowing the danger and of avoiding it. The chart in his possession indicated the existence of shoals along the coast in sight of which the vessel was moving, and that danger therefrom could be avoided by getting the vessel farther from shore whenever a sounding disclosed a depth of 6 fathoms or less.

It well may be inferred that a reasonably skillful and prudent navigator, having only the information which was available to the master of the Silverway, would have had soundings taken at short intervals while proceeding along that coast in sight of land, and would have got his vessel farther from shore whenever a sounding showed that she was in water less than 6 fathoms deep. We think that the evidence calls for the conclusion that the stranding was due, not to a failure to supply the vessel with charts or other publications giving information required for the proper navigation of her on the voyage in which she was engaged, but to the failure of her master to make proper use of information which was available to him, and to take reasonable precautions to avoid a danger which a reasonably skillful and diligent navigator, situated as he was, would have realized in time to avoid it.

Reference was made in the argument to the case of Trinidad Shipping & Trading Co. v. Frame, Alston & Co. (D. C.) 88 F. 528, in which it was decided that the absence of a particular chart directly contributed to the stranding in question. In its facts the cited case is quite unlike the instant one. It appeared in the cited case that the vessel stranded on a submerged rock, which was in or very near the route the master was directed to take; that the presence of reefs or shoals in the locality of the stranding was not indicated on the only chart which was furnished for the use of the master, who was unfamiliar with those waters, but was indicated on another chart which was available to the vessel's owner. As above indicated, the evidence in the instant case showed that a chart which the master had and used indicated the presence of shoals along and near the coast in sight of which the vessel was moving until she went aground, and that danger therefrom could be avoided by not approaching land nearer than where the water was 6 fathoms deep.

We conclude that the decree appealed from was not erroneous on any ground suggested. That decree is affirmed.