THE PEOPLE OF PUERTO RICO, ETC., Plaintiff and Appellee
   *v.* CARMEN ANA AMADEO Y TORO ET AL., Defendants and
   Appellants.

No. 11389.   Resubmitted December 11, 1957.—Decided March 1, 1961.

*Leopoldo Tormes García* for appellants Amadeo Toro and Vendrell Toro. *Rafael Hernández Matos* for the heirs of Bota. *Hiram R. Cancio, Secretary of Justice (José Trías Monge, former Secretary of Justice,* on the brief), and *Jaime J. Saldaña, Assistant Attorney General,* for appellee.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

In this condemnation proceeding the petitioners challenge certain rulings of the trial court regarding the admission of some of the evidence as well as the value it fixed on the condemned land. We shall examine the two problems separately.

I

*First:* As part of their evidence, the petitioners offered an opinion and judgment from the former Tax Court determining the assessment for tax purposes of certain lands

similar to the ones condemned herein. The trial court rejected it on the ground that the valuation involved was different from the one required to be established in the suit. It appears in the record as evidence offered but excluded.

Closely related to the former offer, is the one made by the petitioners of the testimony of an assessor from the Treasury Department who, with the pertinent documents at hand, was to testify on the appraisal of the condemned parcels made by the said Department for tax purposes. Relying on Rule 45 of the former Rules of Civil Procedure, the petitioners had obtained from the clerk of the court the issuance of a summons addressed to the Secretary of the Treasury or to his representative ordering these officials to appear in court to testify on the matters described above. The court did not permit the testimony of the witness and held that Rule 34 was applicable and that the petitioners had failed to meet the requisites of good cause and absence of any other remedy which it requires. In view of the considerations set forth below, it would be idle to decide this last procedural question.

The problem of the admissibility of the assessment of a property for tax purposes as evidence of the value of said property for other purposes has been considered in its manifold aspects in numerous cases. *Valuation for taxation purposes as admissible to show value for other purposes*, 39 A.L.R. 2d 209 (1955); Jahr, *Eminent Domain* 235–240 (1957); 1 Orgel, *Valuation under the Law of Eminent Domain* 629–645 (1953); 5 Nichols, *Eminent Domain* 313–324 (1952). The overwhelming majority of courts in the United States has held that said assessed valuation is not competent direct evidence of the value of a property for purposes other than taxation. This rule has been consistently followed in condemnation proceedings in the federal courts as well as in the state courts. A very small minority has accepted the contrary view, but making it clear in many

cases, that the above-mentioned evidence, although admissible, is of little probative value. *State v. Barbe*, 24 So.2d 372, 373 (La. 1945); *United States v. Phillips*, 50 F. Supp. 454, 458 (D.C.Ga. 1943); *Fort Worth & D.S. Ry. Co. v. Gilmore*, 13 S.W.2d 416, 417 (Tex. 1929).

When it is the condemnor who tries to introduce the evidence of assessed valuation, the courts have refused to accept it adducing technical arguments based on the doctrines of hearsay evidence, *res inter alios acta* and the lack of participation on the part of the landowner in the assessment proceeding.[1]  *Suffolk & C. Ry. Co. v. West End Land & Improvement Co.*, 49 S.E. 350, 351 (N.C. 1904); *Girard Trust Co. v. City of Philadelphia*, 93 Atl. 947, 948 (Pa. 1915); *Kansas City & G. Ry. Co. v. Haake*, 53 S.W.2d 891, 892–894 (Mo. 1932); *United States v. Certain Parcels of Land*, 261 F.2d 287, 289–291 (4th Cir. 1958).   However, in this situation as well as when the owner of the property offers the evidence, the unreliability of said evidence as an index of market value, has been adduced with great emphasis together with the well-known fact that these assessed valuations serve several purposes and not merely the precise determination of the market value of the property. *Savannah Sugar Refining Corp. v. Atlantic Towing Co.*, 15 F.2d 648, 650 (5th Cir. 1926); *Bankers Trust Co. v. International Trust Co.*, 113 P.2d 656, 660 (Colo. 1941); *State v. Barbe, supra* at 373 (D.C. Cir. 1931); *In re Northlake Ave.*, 165 Pac. 113, 114 (Wash. 1917); 5 Nichols, *op. cit.* at 316; Jahr, *op. cit.* at 235. The well-known doctrine that a determination made by a public official cannot bind the state in a sphere of official action beyond the domain of authority of said official has also been opposed to the land-

---

[1] In some states, the tax laws require landowners to submit an assessment of their properties, usually under oath.   Then, these statements are accepted in condemnation proceedings as admissions against interest. Some of the cases cited above discuss this problem.   As we shall see later, these statements are not required in Puerto Rico under the scientific assessment system.

owners' petition. *In re Northlake Ave., supra* at 114. A federal court [2] has convincingly stated this argument:

"The power of a tax official to bind the public is limited, and what he does for purposes of taxation, should not be binding upon the public, or prejudicial to the public interest, when other public officials are engaged in the performance of a very different public function in an unrelated field. Though the tax official may purport to use market value as the criterion of assessed value, his primary concern is with relative, not absolute, values, but however he exercises his judgment for purposes of a reasonable distribution of the tax burden, his act, as an extrajudicial declaration, may not circumscribe the interest of the public in the difficult process of determining just compensation for property taken for public use."

It is now convenient to examine as briefly as possible some aspects of the system existing at present for the assessment of property for taxation purposes. By virtue of Act No. 117 of May 9, 1947 (Sess. Laws, p.. 262, 13 L.P.R.A. § 431 *et seq.*) a system called "scientific assessment" was established in Puerto Rico, according to which a general assessment was made in 1951 and a re-appraisement in 1958–59.

The scientific assessment of property, both in Puerto Rico as well as in other jurisdictions, is not made for the purpose of determining the exact market value of real property. Section 2 of the above-cited Act directs the Treasurer "to establish valuation and assessment standards with such accuracy and scientific details as will permit the fixing of adequate and equitable rates of valuation of property for taxation purposes." Section 3 [as amended by Act No. 37 of 1951] adds that: "The Treasurer shall classify and assess all real property in its actual and effective value by utilizing any of the methods and factors recognized with respect to property valuation and assessment, so that the assessments for each of the different types of property may

---

[2] *United States* v. *Certain Parcels of Land, supra* at 291.

be uniform." [3] The official publications indicate that the aims of the scientific assessment are to establish a fair valuation system for taxation purposes, the uniformity in the assessment and "unit values of assessment based on the market value of the property." [4] It is obvious that the administrators of this system will continually have to make adjustments to reconcile these three objectives. Besides, it is a well-known fact that all tax systems are unavoidably sensitive to the economical and political necessities of the community they serve, and that this sensitivity inevitably increases in the case of assessment of real property, since the latter is the basis for the borrowing capacity of a state. For these reasons a well-known authority in the field of public finance states that the purpose of a scientific assessment system should not be to determine the actual value of the property, but to establish a reasonable and equitable basis for taxation. Taylor, The Economics of Public Finance 301 (1953). Contrary to the former view, the courts are required to make an intense and thorough search in condemnation proceedings in order to establish as precise as possible the market value of a determined property at the time the official taking takes place.

However, it may be stated that, even accepting the above-mentioned difference between the objectives of both types of valuation, the assessed valuation would still be of some

---

[3] The Political Code (§ 295) directed the Secretary of the Treasury "to assess the property at its actual value, considering all factors in valuation and assessment matters including the market value without looking to a forced sale." 13 L.P.R.A. § 447.

[4] Department of the Treasury, *Tasación y Revaloración de la Propiedad Inmueble* 5 (1958). In the case of buildings there is the additional difficulty that the market value is established by means of the "depreciated reproduction cost," and not by the comparison of similar sales in the market, which, as we know, is the prevailing method in condemnation proceedings. Department of the Treasury, *¿Qué es la Tasación Científica?* p. 14. The differences in techniques and results produced by the use of each method are discussed in *Tax Assessment of Real Property: A Proposal for Legislative Reform*, 68 Yale L. J. 335, 344–347 (1958).

service if it is the landowner who offers it as a minimum index of the market value of the property, which is to be weighed together with other pertinent evidence. Cf. *Louisiana Highway Commission* v. *Giaccone*, 140 So. 286, 290 (La. 1932).

This proposition, of course, does not overcome some of the technical obstacles applicable to the assessed valuation which, as we have seen, have been indicated by the case law of the United States,[5] but it does keep its validity where the landowner, as in the case at bar, offers the testimony of an officer who participated in the assessment proceeding and not a mere certificate thereof. Therefore, we must examine the above-mentioned assessment proceeding.

The manner in which the assessment of 1951 was made by the employees in charge thereof has been described in the following manner in an official publication:

"Many persons participate in the new system for the assessment of property, some doing one thing while others do other things, until the assessed value is fixed.

"Some prepare the tables of unit values after much study and investigation, others inspect the properties and note down in cards the measurements and other data about each property, others classify the property following all the details which appear in the cards, and finally, the cards come to the central office where another group of employees multiply the costs or unit values by the measurements or details which appear in the cards thereby obtaining the assessed valuation of the property." [6]

As it may be observed, the scientific assessment of a property is the result of a collective effort made by the employees of a government organization and not the work

---

[5] *United States* v. *Certain Parcels of Land, supra* at 291.

[6] *¿Qué es la Tasación Científica?*, p. 28. In this pamphlet as well as in the one entitled *Tasación y Revaloración de la Propiedad Inmueble* (1958), the proceeding adopted is amply described. Examine, besides, De Pedro, *La Tasación Científica*, 13 Rev. C. Abo. P.R. 385 (1950). For a more detailed and technical explanation, see Department of the Treasury, *Procedures for Real Property Assessment in Puerto Rico* (1953).

of one person alone. Moreover, the "costs" or "unit values" which serve as a basis for determining the market value of the property were obtained after a thorough investigation at different sources, but particularly after long conversations with experts in that matter and on the advice offered by a committee appointed for those purposes. When a reappraisal of the property was made some six years later, "there was no need to again inspect minutely the properties one by one. The physical inventory of each property was already made when each property was assessed for the first time under the System of Scientific Assessment. It was only necessary to readjust the former values according to the change in values that had taken place during the last years."[7]

Therefore, one person alone even in the case of an executive, of those who intervened in this complicated proceeding, would not be competent to offer testimony, of his own knowledge, regarding all the elements which integrate the assessed valuation, when the latter is offered as evidence of the value of the condemned property. To overcome this obstacle, it would be necessary to offer the testimony of all the persons who in one way or another have participated in this proceeding. In the hypothesis, although highly improbable, that this could be done, it would be necessary to reproduce in the

---

[7] *Tasación y Revaloración de la Propiedad Inmueble*, p. 18. Observe, besides, the effect which the general norms of depreciation have upon the market value. "Having established the market value of each property, of the land as well as of the buildings, we had only to make the final adjustment to establish the value upon which the tax for the coming years would be imposed until the next general reappraisal is made. Calculating that it may take from seven to ten years before a new general revision is made of the values of the properties for taxation purposes, it was decided that it would be convenient to readjust the actual market value, crediting to each building an anticipated depreciation for the number of years during which a general revision of the valuation is not to be made. It was likewise deemed prudent to make a reducing adjustment corresponding to the value of the lands upon the contingency that the land would depreciate during the coming years and thus avoid as far as possible that the value fixed on a property for taxation purposes would exceed its market value during the next years." *Id.*, p. 22.

condemnation suit all the details of the assessed valuation proceeding. This evidence, of course, would have to be admitted from the landowner as well as from the condemnor.

In short, the system of real property assessment for taxation purposes does not seek a completely individualized valuation of each property in order to determine with the greatest possible accuracy its true market value, but on the contrary, is based on norms and standards of general application to properties which are similarly located, and it has other additional objectives and answers certain economic and political necessities which can have no weight whatever on a valuation for condemnation purposes. The final determination of that assessed valuation is the product of a complex proceeding in which numerous persons intervene directly. The scant light which this official determination or the testimony regarding it may shed in some isolated cases would not compensate in any way whatsoever the confusions and delays— "a concession to the shortness of life," as phrased by Holmes—which would necessarily result when the scalpel of cross-examination penetrates deeply into the complex anatomy of that system in order to extricate those elements which may be persuasive in a condemnation proceeding. This is a clear example of technically admissible evidence which should not be admitted for powerful reasons of a normative character.[8]

Besides, an examination of the applicable legal provisions reasserts that the Legislative Assembly was aware of the difficulties which we have described. Section 3 of the above-cited Act of 1947, as amended by Act No. 228 of May 5,

---

[8] Examine Rule 303 of the Rules of Evidence for the General Court of Justice, adopted by this Court and sent to the Legislative Assembly at the beginning of the present year; Rule 303 in the American Law Institute, Model Code of Evidence 180 (1942); Rule 45 in National Conference of Commissioners on Uniform State Laws, *Uniform Rules of Evidence* 189 (1953); and James, *Relevancy, Probability and the Law,* in Association of American Law Schools, *Selected Writings on the Law of Evidence and Trial* 610 (1957).

1950 (Sess. Laws, p. 580, 13 L.P.R.A. § 432) provides in its last sentence that: "The returns, cards, plans, maps, photographs, schedule, charts, and all other documents and information obtained and used by the Secretary of the Treasury in classifying, valuating, and assessing property by the scientific method herein prescribed, shall be evidence and shall constitute prima facie proof, *for taxation purposes*, of the circumstances and of the assessed valuation of the property to which they refer, and as such shall be admitted as evidence by the courts of Puerto Rico; Provided, that the Secretary of the Treasury or any agent designated by him may testify on the information contained in such evidence and its relationship with the value of the said property to which it refers." (Italics ours.) The legislative declaration which orders the limitation of this evidence to "taxation purposes" is subject to other legal provisions even in the taxation field itself. Thus, for example, in the case of inheritance and gifts taxes, the pertinent law authorizes the Secretary of the Treasury to order the appraisal of "all estates granted or the object of a grant, as the case may be, at their market value as of the date of the death or of the grant." 13 L.P.R.A. § 895. It is known that that special assessment is made in all cases. In the field of income taxes, examples may be cited also of some special assessments which ought to be made at a certain time and for the purpose of obtaining the "market value" of certain specific properties.[8a] See §§ 23 (*m*)-7, 23 (*m*)-25 and 113 (*a*) (2)-1 of the Income Tax Regulations of 1954 (1958).

For the reasons stated in the case law of the United States outlined above and of the realities of our system of assessment which we have described, we hold that the official determinations regarding the valuation for the purposes of

---

[8a] It is not necessary, of course, to decide in this case whether or not evidence of valuation for purposes of property taxation is admissible in cases related to other taxes.

property taxation [9] and the documents or testimonies regarding these determinations do not constitute admissible evidence of the market value in condemnation proceedings. Therefore, the trial court did not commit the errors charged.

■■ *Second:* The petitioners complain also of the action of the trial court in refusing to admit certain evidence offered by them of some allegedly similar sales and in accepting other submitted by the respondent. Before considering these points, it is necessary to offer a brief description of the condemned parcels.

The first or parcel A has an area of 1.1980 cuerdas and the second or parcel B of 4.9955 cuerdas. They are adjacent to each other and are located, with a front of 223 meters, at kilometer 23, hectometer 3 of State Highway No. 23 leading from Ponce to Guayanilla, at a distance of 400 meters from Villa Street and at about 200 meters from Roosevelt Avenue. In front of parcel B and on the other side of Highway No. 23 there is a part of an extension of the housing project known as Rosaly, a two-story building where there is a *"lechonera,"* bar and dancing, and three small frame houses of little value. In front of the condemned parcels there is also a sugar cane plantation covering around 200 meters up to a modern development built by the Fullana Corporation. They are bounded on the north by a private road of earth and gravel which separates them from the Baldorioty housing project, a development provided with a minimum of public services and occupied by persons of low income. They are bounded on the south and the west by an agricultural zone dedicated to the cultivation of sugar cane. About 150 meters from the southern part of the parcels there is a vocational school and about 400 meters therefrom lies the new athletic stadium of the city.

---

[9] This rule is applicable a fortiori when, as in the case at bar, one of the proofs offered is the assessed valuation of a property allegedly similar to the condemned land.

The trial court also found that:

"For five cents a person can go from the condemned parcels to any place in the city of Ponce. They are relatively close to churches, hospitals, drugstores, schools, and to commercial and industrial establishments.

"Highway No. 23, which, as we mentioned above, runs in front of the condemned parcels, is 13 meters wide and asphalted.

"Both parcels have access to electric and telephone lines and to the aqueduct and sewer system, both of pluvial and contaminated waters, which run along said piece of road.

"At the time of the expropriation, there was also a concrete sidewalk, 3 meters wide, running all along parcel B from north to south for a length of 70 meters. Besides, in front of both parcels there were two fire hydrants in use.

"Both parcels are located at the road level. They have a flat topography with a slight unevenness towards the northwestern part which gives them a good natural drainage.

"At the time of the expropriation both parcels were devoted to the growth of sugar cane (like the lands belonging to the main properties from which they were segregated and by which they were bounded on the west and south). But the best use to which both condemned parcels could have been devoted was for the construction of a residential development. For this it would have been necessary to lay out streets and sidewalks, to extend the lighting, water and sewerage systems, and to incur in other development expenses at a cost of $2.25 or $2.50 per square meter."

The petitioners sustain that the market value of the condemned parcels is $2 per square meter, while the respondents and the trial court appraised them at $0.75 per square meter.

In the first place, it is alleged that the court committed error in refusing to admit documentary evidence regarding a transaction which took place between Luciano Martiniano García and the Asilo de Damas. The parcel object of that transaction has an area and a topography similar to the ones of the condemned parcels and it lies relatively near them, but it is located in Villa Street, a zone of great commercial and industrial development and surrounded by important establishments. Because of this essential difference in loca-

tion the documentary evidence was not admitted. In so doing, the court acted correctly. *Housing Authority* v. *Viera*, 72 P.R.R. 683, 687–88 (1951); *Commonwealth* v. *Bravo*, 79 P.R.R. 732, 737 (1956).

There was no error either in rejecting two documents offered by the defendants which contained copies of the judgments rendered by the Superior Court, Ponce Part, in condemnation proceedings against parcels allegedly similar to the ones examined in the case at bar. In *People* v. *Colón*, 73 P.R.R. 531, 540–41 (1952), we explained the reasons why this evidence is not admissible.

The petitioners also object to the rulings of the court admitting a sale from the Ponce Cement Corp. to the Fullana Corp., another from Telares de Puerto Rico, Inc. to the Industrial Development Company, and another from La Reparada Development Co. to the Long Construction Co. In synthesis, they sustain that there are important differences in area, location, facilities, conditions of the soil, etc., between the parcels involved in those transactions and the condemned parcels which precluded the admission of the former as similar sales. The court did not mention in its findings the sales made by Telares [10] and La Reparada, wherefore we must conclude that it did not give them any weight whatsoever. Although the property sold by the Ponce Cement Corp. to the Fullana Corp. is different from the condemned parcels in several aspects,[11] the court certainly did not abuse its powers in admitting the bill of sale.

## II

The petitioners challenge the value assigned by the court to the condemned parcels, since they believe that

---

[10] The sale made by Telares was not admitted by the court as an example of a similar sale but as a sale used by respondents' expert to verify by way of contrast rather, his judgment regarding the value of the condemned lands. In view of the circumstances, it is unnecessary to discuss this action taken by the court.

[11] See, *infra*, pp. 24–27.

its weighing of the evidence was erroneous. They object the specific consideration given to certain elements as well as the general weighing of the entire evidence admitted.

*First:* Regarding the first aspect, the initial objection refers to a sale of a parcel of land made by the Ponce Cement Corp. to the Industrial Development Company at $4,500 per cuerda, little less than a month before the taking of the parcels expropriated by the state. It was admitted as a similar sale, but when rendering its judgment, the court refused to consider it because "as stated by defendants' expert himself, the best use for this parcel was for industrial purposes."

The parcel in question has an area of 3.39 cuerdas and is located in the ward of Canas,[12] about 1.7 kilometers from the condemned parcels. It is very similar to the latter in area, topography, quality of the soil, in transportation, electricity and water facilities and in the access it has to other public services and commercial establishments. From all the transactions admitted, it is the one closer to the date of the expropriation. It is located further away from the center of the city than the condemned parcels and it has the disadvantage that it does not abut on the road, for which reason an alley must be used in order to get there.

We hold that the trial court erred in not granting any probative value whatsoever to this sale for the mere fact that the best use for the parcel "was for industrial purposes," while the best use for the condemned parcels was residential. This is without doubt an important difference which should be given the consideration it deserves, but in view of the remarkable similarities indicated above, it is not in itself sufficient to reject this evidence, specially when it was established that the condemned parcels were susceptible of being used for an industry, and that no official prohibition

---

[12] That is the same ward wherein the condemned parcels are located.

of such use existed at the time of the taking.[13]   *Cf. Commonwealth* v. *Ocean Park Development Corp.*, 79 P.R.R. 149, 161–63 (1956).

■ The court admitted a sale from the Porto Rico Iron Works to the Puerto Rico Housing Authority, but in its findings it decided that, although it "was sufficiently similar" to the condemned parcels, it could not give "great weight" to this transaction because "(a) the buyer had the power to expropriate, (b) the existence of a special necessity or convenience on the part of the buyer could be inferred from the contiguity of said lands to the Ponce de León housing development and (c) the parcel has two fronts, one facing Highway No. 23 and another facing Roosevelt Avenue, which is a first-rate avenue." The parcel in question has an area of 13.1225 cuerdas and is located in front of the condemned parcels, on the other side of the road. In 1946 it was sold at $5,109 per cuerda. Its topography, facilities and access are similar to those of the condemned parcels but its soil is of an inferior quality (saltpetrous, "swampy") and it is in part adjacent to the slum Palo de Pan and to the railway track.

In *Puerto Rico Housing Authority* v. *Valldejuli*, 71 P.R.R. 600, 602 (1950) we held that sales to an entity which has the power of condemnation "must be scrutinized more closely than those to persons not possessing the power to condemn. And the burden is on the person offering them to show they

---

[13] The respondents find additional support for the judgment rendered by the trial judge in the fact that the parcel sold by the Ponce Cement Corp. is located in Villa Street. Aside from the fact that the court did not base its judgment on that ground, we have the circumstance that there is no showing in the record to the effect that the exact location of this parcel, although in a street of greater importance than that where the condemned parcels are located, is actually so different from the location of the latter, as to require, like in the case of the parcel sold to the Asilo de Damas, that no consideration whatsoever be given to it. It should be remembered that the evidence established that there are important differences in the values of the properties of Villa Street, depending upon the place where they are situated and also, that Villa Street goes through the city and is the way-out to several towns.

were free and voluntary, although aided by the presumption that like other sales they were not under compulsion. But once they are found to be voluntary, they must be treated like other sales; *i.e.*, they must be admitted if found to be contemporaneous sales of similar property."

The defendants offered the testimony of Mr. Luis Ferré, vice-president of the company making the sale, who stated in synthesis that the sale had been completely voluntary, that there had been no pressure or threats of condemnation, that the conversations lasted for several weeks and that originally a higher price was asked but that later, when the purpose for which the parcel was being purchased was revealed, a reduction was made. We believe that this uncontroverted testimony is in accordance with the rule established in the *Valldejuli* case, that it shows that the sale was voluntary [14] and that it considerably weakens the argument of the "special purchaser." Besides, the last two factors mentioned by the court are set-off in part by the advantages we already pointed out that the condemned parcels had over the one sold by the Porto Rico Iron Works, and by the general rise in the valuation of land in the city of Ponce from 1946 to 1951. We find, therefore, that the court erred in not giving any weight whatsoever to this sale.[15] As we shall see hereafter, this is actually what it did.

---

[14] At the hearing of the case, the respondents requested that the testimony of Mr. Ferré be eliminated, since he was not the person who had signed the deed on behalf of the company making the sale. This specific contention was never decided and the sale was admitted "for the probative value which it may have." There is nothing in the record to prove or even suggest that Mr. Ferré did not have direct and personal knowledge of the facts reported by him.

[15] The petitioners also challenge a ruling of the court refusing to admit, as a similar sale, a transaction between the Puerto Rico Housing Authority and the Ponce Housing Authority involving the parcel sold by the Porto Rico Iron Works. This transaction was made at the same rate as the former sale. Considering our judgment on the first sale, it is unnecessary to decide whether or not the refusal of the court to admit the second sale constitutes error.

■ The court admitted documentary evidence regarding the sale of a parcel of land made by Arturo Febry to La Rambla Development Corp. in 1948 for the sum of $5,158.12; but finally it decided not to give it "any probative weight whatever" because "aside from the difference in area between this parcel and the condemned lands, the purchaser acquired said parcel to enlarge the La Rambla Development" and for that reason it was a "special purchaser." [16]  The parcel sold by Mr. Febry has an area of 1716.04 square meters and is located at one end of Ponce, opposite to the one where the condemned parcels are situated, and about three kilometers from the center of the city. The zones are, however, very similar, as well as the topography, facilities, services and access of the parcels and the best use to which they could be devoted. Unlike the condemned parcels, the parcel sold by Mr. Febry did not have access to the sewerage system. Although the reasons which the court had are meritorious, we do not believe, after the other circumstances have been considered, that they can destroy by themselves the entire value of his evidence. It should have been given some weight.

■ The court also admitted three sales of lots located in the vicinity of the condemned parcels and gave them weight as an indication of the value of the lots in the zone but not as "an adequate indication of the value of the condemned parcels" since they are "isolated lots which do not form a part of an urban development and their limited area increases their unitary value." One of the lots measured 984 square meters and had been sold in 1948 at $1.52 per square meter; another had 707.84 square meters and had been sold in 1950 at $3.18 per square meter, while an adjacent lot of 638.75 square meters was sold in the same transaction

---

[16] There is no specific evidence in the record regarding the way in which this situation affected the price of the sale. The inference made by the court, although obviously correct, does not constitute sufficient ground to rule that the sale was not voluntary. *Cf. People* v. *Colón, supra* at 536–538; *People* v. *Heirs of Rabell,* 72 P.R.R. 536, 542 (1951).

at $2.81 per square meter; and another of 3,377.61 square meters had been sold some months prior to the expropriation at $2.72 per square meter. Aside from their area, the lots are very similar to the condemned parcels regarding all their other characteristics.[17]

It is impossible to determine the persuasive effect which a sale considered as an "indication of the value of the lots in the zone" may have in opposition to the same sale considered as an "indication of the value of the condemned lands" in the mind of a judge.[18] We shall not attempt to determine it. In any case, it is necessary to remember that in several cases we have affirmed rulings of the trial courts which admitted and gave weight to, as evidence of similar sales, certain transactions involving parcels of land which had great differences in area with the ones condemned in said cases, but which were similar to them in other aspects.[19]

▇▇▇ *Second:* The petitioners challenge the general weighing of the evidence on the ground that the court gave a decisive weight, in the aspect of similar sales,[20] to two

---

[17] Three of these lots did not have access to the sewerage system.

[18] Of course, this is not the case of lots located near the condemned lands belonging to a development in full growth and whose price is used as an indication of the value of an undeveloped tract suitable for residential use after subtracting therefrom "the costs of development, the reduction in area resulting from subdivision, and a reasonable profit for the promoter." *Commonwealth* v. *Ocean Park Development Corp., supra* at 153–154; *United States* v. *Iriarte,* 166 F.2d 800, 804 (1st. Cir. 1948).

[19] *People* v. *Carmona,* 70 P.R.R. 292, 296 (1949)—parcels of 200, 400 and 1,000 square meters compared to an area of 1.90 cuerdas on the part of the condemned parcels; *People* v. *Heirs of Quiñones,* 71 P.R.R. 242, 244 (1950)—lots of 300 square meters compared to 2,947.79 square meters; *People* v. *Colón, supra* at 533–536—877 square meters compared to 12,402.05 square meters.

[20] The court also gave weight to the peculiar circumstances prevailing in the land market of the city of Ponce. This action was entirely correct. Regarding this aspect, the court concluded that in Ponce the demand for lands suitable for urbanization had been relatively stable, that the city had about 4,000 cuerdas of flat land for its urban expansion and that this "operates against the value of the available lands due to the relatively stable demand."

transactions made on September 29, 1950 between the Ponce Cement Corp. and the Fullana Corp., and that it practically rejected all other evidence. The petitioners are correct.

The above-mentioned transactions involve two parcels of land sold to the Fullana Corp., one of 25.876 cuerdas at $2,500 per cuerda and another of 29.451 cuerdas at $3,400 per cuerda. Besides the price paid therefor, the purchaser bound itself to "pave with cement" [21] all the streets of the development to be constructed, and to build on its own account, and "also of cement," the extension of the streets of said development up to a parcel belonging to the vendor, reserved for the construction of an avenue, and across a strip of land 40 meters wide belonging also to the vendor. There is no evidence in the record as to the amount of this obligation, but doubtlessly its performance must have resulted in considerable benefit to the vendor. Furthermore, the purchaser had to acquire a lot and a building located on Hostos Avenue in order to provide an outlet for the parcels.

The parcels mentioned above are located about 150 meters from the condemned lands. They are similar to the latter in topography, facilities, access and most suitable use of the lands. They are at an advantage over them with regard to location, since they are closer to the Mariani Development and to the campus of the Santa María University, but at the same time they are at a disadvantage with regard to certain aspects. They are adjacent on one side to the slum Palo de Pan and on the other side to the railway terminal, which, in the judgment of the experts, reduces their value for residential purposes. At one end they have a ditch or gully, which also has an unfavorable effect on their price. The electricity, water and sanitary services of the city are not directly in front of them as in the case of the condemned parcels, but they are situated in the Mariani Development

---

[21] It should be borne in mind that the company making the sale is engaged in the manufacturing and sale of cement in the city of Ponce.

and Hostos Avenue, and this requires additional expenses in order to gain access thereto. They do not have access to the telephone lines. In short, although the sale of these parcels was correctly admitted as evidence of a contemporaneous sale of similar property, we do not believe that they should have been given the decisive and practically conclusive weight which the trial court granted them. The great difference in area between them and the condemned parcels,[22] the peculiarities of the selling "price" and the other elements we have described rather suggested that a relative merit be given to them jointly with the other transactions which could enlighten the mind of the judge.

We are aware that there are no two identical properties and that the comparative method only requires similarities and not equality. For this and other reasons, in cases of this sort, we rely as a general rule, on the exercise of the well-informed discretion of the trial court, who has the opportunity of gauging at a closer distance than we do, the different elements which should integrate a valuation judgment. And we have repeatedly held that we shall not intervene with that discretion, even when the court has erred in some rulings regarding the admission of evidence, provided its valuation judgment finds sufficient support in the evidence admitted. *Commonwealth* v. *Bravo, supra* at 739; *P. R. Housing Authority* v. *Colón*, 73 P.R.R. 208, 213 (1952); *People* v. *Carmona, supra* at 296; *People* v. *Lamboglia*, 70 P.R.R. 773, 779 (1950). However, we believe that in the case at bar the judge unreasonably limited the scope of his final search to practically only one of the similar sales and that he unnecessarily rejected several others of similar per-

---

[22] Besides the differences existing between the areas of the condemned parcels and the ones sold to the Fullana Corp. taken individually, it is convenient to remember that the Ponce Cement Corp. sold the two parcels —which amount to 55 cuerdas—to the Fullana Corp. in the same transaction. The inference suggested by the petitioners that this combined sale affected the selling price in an unfavorable way is reasonable.

suasive force. Similar sales constitute, as we know, the best evidence of market value in condemnation proceedings. *P. R. Housing Autohrity* v. *Valldejuli, supra* at 603. In the case at bar there is practically no other evidence, because the one regarding the land market in the city of Ponce is by its general character, of a complementary nature, and because the valuation criteria of the experts of both parts were mainly based on the authority which each one gave to the similar sales.[23]

. We are convinced, in view of the reasons already stated, that the trial court committed "manifest error" in the weighing of the evidence and that its ruling was prejudicial to the right of the petitioners to receive a fair compensation for the condemned parcels. *Cf. P. R. Housing Authority* v. *Valldejuli, supra* at 603. Therefore, the record will be remanded to the trial court with instructions to make new findings of fact and conclusions of law in the light of the views stated in this opinion and that a new judgment be rendered.

The judgment appealed from is reversed and the case remanded for further proceedings not inconsistent with this opinion.

---

MR. JUSTICE SANTANA BECERRA, dissenting.

It is impossible for me to concur in that part of the opinion of the Court which states "that the official determinations regarding the valuation for the purposes of property taxation and the documents . . . regarding these determinations do not constitute admissible evidence of the market value in condemnation proceedings," and which in my judgment absolutely eliminates said evidence no matter what the circumstances of each particular case may be,

---

[23] The trial judge also made a personal investigation of the condemned parcels.

whether it is produced by the testimony of witnesses or by an official certificate of the assessment. With my greatest deference towards the majority view, it does not seem to me, for the reasons which I shall hereinafter set forth, that such rule of absolute exclusion of this evidence is justified in Puerto Rico, and much less in the circumstances like the ones in the case at bar.

Regarding the question now in issue, the record of this condemnation proceeding shows that the defendants requested in writing a subpoena directing the witness Mr. Carlos Archevald, from the Assessment Bureau of the Treasury Department having a branch office in Ponce, to attend and give testimony "bringing with him all the working sheets, papers and reports which he has in his possession and which refer to the assessment he made as an officer of the Treasury Department of Puerto Rico, with regard to the parcels of land belonging to said defendants and which are the object of the condemnation . . ." The plaintiff had also requested in writing that said subpoena be set aside because (a) the "relevancy" or materiality of the evidence requested did not appear upon the face thereof, and it was required that good cause be shown to the Court wherefore said evidence was indispensable, invoking to this effect Rules 45 and 34 of the Rules of Civil Procedure (1943) and the decision rendered in the case of *Cortés* v. *District Court*, 65 P.R.R. 154; (b) because neither the production of the documents nor the testimony requested were appropriate since they were exempt as they constituted privileged matter and inadmissible in evidence and (c) because a public official could not be compelled to testify against the interests of the government which he represented. When Mr. Archevald was called to the witness stand, at the trial there was a full discussion of the objections raised by the plaintiff (record, pages 392 to 410) and the trial court finally set aside the

subpoena issued by the clerk and did not permit the witness to testify.[1]

The record also shows that the compensation deposited in court by the plaintiff for each parcel of land at the rate of $3,000 per cuerda—which was the same compensation ultimately fixed by the Court—was determined on the basis of a valuation made by the Department of the Treasury through Mr. Ferdinand Acevedo. When he made this

---

[1] The reasons set forth by the trial court to set aside the subpoena were the following:

"That upon the face of the motion for the subpoena and according to the arguments set up by counsel for the defendants, it appears that said motion is one for the discovery of evidence rather than a subpoena duces tecum. If this were so, it was governed by Rule 34 and good cause would have to be shown in order to compel the witnesses thus summoned to produce the documents or the information requested. Irrespective of whether the plaintiff in the case at bar is the State and the persons subpoenæd are officials of the State, and this being a motion directed by a party to another party in the law-suit, through its agent, Rule 34 is also applicable regardless of the fact that Rule 45 does not expressly require that good cause be shown to compel the production of documents. We have had the opportunity to examine this afternoon, before the hearing, Monroe [sic] on Federal Procedure and in the pertinent section of Rule 45, § 45.5, subdivision 2, page 1722 of Vol. V he states that when a subpoena duces tecum is used by one party directed to another party in the lawsuit, the provision of Rule 34 must be complied with and good cause must be shown in order that the subpoena be issued by the Court and not by the clerk thereof. The two answers to the complaint were filed one on May 15, 1951 and the other on July 26, 1951. The Court believes that the defendants have had more than sufficient time to make use of Rule 34 and for obtaining, if appropriate, the inspection of those documents pursuant to the provisions of Rule 34, and the assessment by an expert from the Government being also involved herein, it was also required in accordance to what Monroe [sic] sustains with regard to this particular in his work cited above, that good cause be shown to order the production of the documents or information sought and according to the commentaries of Monroe [sic] regarding this last aspect, that it must be shown to the satisfaction of the Court that the party requesting the information or the documents did not have any other means available to obtain the facts it sought to obtain by the use of the subpoena duces tecum pursuant to Rule 34, and since it has not been shown to the Court that the refusal to permit the defendants to use the subpoena duces tecum would work an injustice to them in the presentation of their case, the Court, therefore, sets aside the subpoena issued by the clerk directed to the Secretary of the Treasury and to Mr. Carlos Archevald, employee of the Treasury Department."

valuation on April 6, 1951, the date of the taking, Mr. Acevedo was the General Supervisor of Assessments of the Department of the Treasury, which office he held until June 30 of that year. Mr. Archevald was an assessor of said Department, supposedly under the supervision of Mr. Acevedo, and he appeared, as stated by plaintiff's counsel at the hearing, both in his own personal capacity and as representative of the Secretary of the Treasury. According to the record, the question, as such, of whether or not evidence regarding the assessed valuation of the property was admissible in this condemnation proceeding, was not before the consideration of the court, nor did the court state its view on this point. It is in the brief submitted to us where it is mentioned for the first time that the testimony rejected involved an assessment for such purposes. The majority of the Court does not find it necessary to decide the assignment of error dealing with this incident because, as I stated at the beginning, the rule of the absolute exclusion of the evidence is adopted to prevail in Puerto Rico.

The exclusion or admission of evidence regarding assessed valuations [2] in condemnation proceedings presents several modalities which should be taken into consideration. Orgel approaches the problem in two ways: whether the assessed valuation of the property may be used as the sole and exclusive criterion of just compensation; and, assuming that just compensation may not be based entirely on tax valuations, to what extent may the latter be admitted as evidence in condemnation proceedings. The commentator concludes that while assessed valuation may not be conclusive as to the proper valuation for purposes of compensation in eminent domain, it does not necessarily follow that it is wholly

---

[2] The reference made in this opinion to the "assessed valuation" should be understood as meaning the assessment made in order to impose a property tax, (assessment roll) and not to assessments for other taxation purposes or *ad hoc*.

irrelevant in arriving at this latter amount.[3]   Nichols, expounding the exclusion of this evidence, observes that in many parts of the country the assessed valuation would be of little real help in eminent domain proceedings, for it is not everywhere customary to assess real estate at its full market value, but he adds that in some states, however, the assessed valuation is intended to represent the fair market value of the property, and if the assessors are men of integrity and skill, the assessed value is usually given consideration in fixing the price at a voluntary sale or in settling eminent domain proceedings out of the court, and he states that *it would be of real service to a jury as a definite starting point for their deliberations.*[4]

It is the view of a majority of the courts that assessed valuation of itself does not constitute admissible evidence of the value of the property for purposes other than taxation. On the other hand, it has also been the view of the majority of the courts, with few exceptions, that the assessed valuation constitutes an indication of the value of the property when the value for taxation purposes has been fixed by the owner himself or with his participation, which is admissible in those cases of a different nature where the value of the property has been at issue and the owner himself has been a party to the lawsuit.   These have been chiefly cases of condemnation proceedings and actions brought by the owner to recover for damages done to the property.   (See 39 A.L.R.2d 209, 212, 214, 225.)   As far as it has been possible to examine the situation, it must be set forth that the generally accepted rule of the exclusion of this evidence has been established, in the great majority of the cases, in which the evidence was offered—to limit ourselves to eminent domain proceedings—by the condemnor against the owner or condemnee, in an attempt not to compensate beyond the

---

[3] "Valuation Under the Law of Eminent Domain", 2d ed., Vol. 1, pp. 632–663.

[4] The Law of Eminent Domain, 3d ed., Vol. 5, p. 316.

taxable value.[5]  Undoubtedly, this fact has had much to do
with the formulation of the general rule, and to a great
extent with its justification, if the *raison d'etre* thereof is
considered.  The reason why this evidence has been mainly
excluded has been the fact, commonly admitted by the courts
in those jurisdictions, that ordinarily and usually, the asses-
sors, as a matter of fact, do not assess the property for pur-
poses of taxation at its full actual value or at its market
value, the assessment in those cases, therefore, not consti-
tuting pertinent or reliable evidence of value for purposes
other than taxation.   Considering the facts mentioned above
as a whole, as well as the basis of the law of evidence which
the courts have ordinarily applied to reject the evidence in
question (39 A.L.R.2d 209, 213, 223–229; Nichols, *op. cit.*
at 315; Orgel, *op. cit.* at 634–636, *res inter alios acta*, hear-
say evidence, *ex parte* statements, evidence not subject to
cross-examination), it may be said that the rule of exclusion
was formulated primarily for the protection of the owner
of a property, claimant, against the adverse effects which
an evidence of value resulting from determinations made
without his participation has upon him.   It is easily ex-
plained, in contraposition, that as an almost unanimous rule,
this evidence has been held as admissible, when the assessed
valuation has been fixed by the claimant owner himself, as
an indication of value made by him which may be used as
an admission against interest or to contradict his testimony
or to impeach his credibility.   A survey of the cases does
not show that this evidence has been chiefly excluded for
other reasons or because in every eminent domain case, there
necessarily has to exist an irreconcilable incompatibility

---

[5] Orgel, *op. cit.* at 638, as well as Nichols, *op cit.* at 314 point out
this fact.  It is also indicated in *United States* v. *Certain Parcels of Land,*
*etc.,* 261 F.2d 287, 291 (C. A. 4).  There have been cases where the
evidence was offered by the condemnee and it was excluded, as in the
case cited above, but ordinarily the situation has been otherwise.

between the concepts and elements of value used for one or other purposes.[6]

Considering the majority rule which has excluded this evidence in terms of its *raison d'etre*, the situation before us presents, to my judgment, a different aspect. In § 295 of the Political Code of 1902, as amended by Act of March 10, 1904, it was provided by the Legislative Assembly that the assessor should proceed to assess the property "*at its actual value*" *in the market*, without looking to a forced sale, according to his best information and belief. When the "Act for the Cadastration, Classification and Assessment of Property" was approved in 1947 (Act No. 117 of May 9, 1947), § 2 thereof authorized the Treasurer of Puerto Rico to make a cadaster of all real property and to classify all tangible personal and real property and "to establish valuation and assessment standards with such accuracy and scientific details as will permit the fixing of adequate and equitable rates of valuation of property for taxation purposes." Section 3 of said act as it was originally approved, provided that the Treasurer should classify all agricultural lands on the basis of the most profitable and reasonable use to which the same may be applied, the Treasurer having to take into consideration all such factors as he may deem pertinent, upon investigation and recommendation by the technical personnel that he may appoint for the effectuation of the purposes of the Act, including: (a) . . . . , (b) . . . . , (c) . . . . , (d) "prevailing market-prices for the various classes and types of lands in their respective jurisdiction."

---

[6] Regarding the very few cases, in comparison, where the evidence excluded was offered by the owner or condemnee, it was usually rejected in the light of the specific purposes for which it was offered. See, for example, the situation in *In re Northlake Ave.*, 165 Pac. 113; *Dallas* v. *Malloy*, 214 S.W.2d 154 and in *Girard Bros.* v. *City of Philadelphia*, 93 Atl. 947. *Cf. Bowie Co.* v. *United States*, 155 F.2d 225; *United States* v. *Delano Park Homes*, 146 F.2d 473, 474; *United States* v. *Certain Parcels of Land, etc., supra* at 291.

Upon the amendment of § 3 by Act No. 228 of May 5, 1950, it was provided that the Treasurer shall classify and *assess* all property on the basis of the most profitable and reasonable use to which the same may be applied, taking into consideration etc., including: . . . . (d) "Prevailing market-prices for the various classes and types of lands in their respective jurisdiction." Thereafter, § 3 of the "Act for the Cadastration, Classification and Assessment of Property" of 1947 was amended again by Act No. 37 of March 27, 1951 to provide that the Treasurer shall classify and assess all real property *"in its actual and effective value* by utilizing any of the methods and factors recognized with respect to property valuation and assessment, so that the assessments for each of the different types of property may be uniform." This amendment was approved with retroactive effect to January 1, 1951. In the amendment made during that time to § 295 by Act No. 133 of April 27, 1950, the original terms used in 1904 to the effect that the property shall be assessed *"at its actual value, [in the market] without looking to a forced sale,* according to his best information and belief," was somewhat changed to the property shall be assessed *"at its actual value,* considering all factors in valuation and assessment matters, *including the market value,* without looking to a forced sale."

The amendments made in 1950 and 1951 to the assessment Act of 1947, considered together with the amendment made in 1950 to § 295, undoubtedly show that the Legislator once more ratified, if it could have been understood as substituted, the rule in effect since 1904 which requires that the property be assessed for taxation purposes at *"its actual value,"* including, among the other factors to be considered, its market value. Although the Legislative Assembly left it to the good administrative judgment to adopt the most precise and scientific methods for making the assessment, the valuation resulting therefrom, whether the product of

one person only or the aggregate criterion of a group of persons acting together, shall represent by operation of law the *actual and effective value* of the property. With due respect to his authority, I do not find suitable, in the light of the legislative standards prevailing herein, the statement made by commentator Taylor to the effect that the purpose of a system of scientific assessment should not be to determine the "true" value of the property but to establish a reasonable and equitable tax basis; nor is it possible for me to fully agree in that the system for the assessment of real property does not seek (in Puerto Rico) a completely individualized valuation of each property in order to determine with the greatest accuracy possible its "actual" market value.[7]

Under our system, the assessment of the property at its *actual and effective value* for taxation purposes may result to the owner, in certain specific circumstances or cases, in the fixing of an absolute value greater than the social and relative market value, but conceivably at law, not less than the market value, one of its elements. It is presumed that the officials comply with the law, and even if because of certain specific circumstances the value of the assessment were not so, the fact could always be explained before a judge.

The main reason which other jurisdictions have had to reject this evidence is not, in my judgment, present here, nor does it seem to me that the value for taxation purposes fixed pursuant to the provisions of § 295, as amended by

---

[7] Everything tends to indicate that the administrative standard has fully complied with the legislative rule. See footnotes 4 and 7 of the opinion of the Court—"Having established the market value of each property, of the land as well as of the buildings . . ." (footnote 7). The adjustments to this value which follow tend to prevent, as it is set forth at the end of the footnote, that the property should exceed its market value during a period of years following until a new revision is made.

The fact that the assessment is also used to fix constitutionally the borrowing capacity of the nation, serves to buttress the view, for obvious reasons, that the same should represent the actual value.

Act No. 133 of 1950, is so absolutely estranged from the market value of the property or is so alien to it, that it should be required, as a general legal rule applicable in every case of eminent domain, that this evidence be considered as inadmissible for the determination of value, irrespective of the circumstances of each particular case, or who is the condemnor, or which party offers the evidence or for what purpose. The constitutional view of just compensation as traditionally interpreted requires the owner to receive—setting aside the incidental elements of compensation—the exact *value* of the condemned property, neither more nor less. The fair market value, that concept of value which among us, as in the majority of jurisdictions has been adopted as the standard or measure for just compensation, [the price in cash at which the property would at that time change hands in a transaction between a willing buyer and a willing seller, *Iriarte* v. *United States*, 157 F.2d 105, 110 (C. A. 1)], does not involve a unitary concept. The fair market value is a synthetic expression which combines and summarizes all those elements and characteristics of the property which fix a *specific price* in a voluntary transaction free from coercion. The concept of *actual and effective value* can not be abstracted from those elements and characteristics of the property, or it would cease to be, at least, *actual* value.

I do not hold either, that for the reasons stated above, the assessed valuation is admissible a fortiori, as a question of law, in every case of eminent domain and in every circumstance, or that it may not be properly excluded pursuant to the applicable rules of the law of evidence that would preclude its admission. The judicial determination of just compensation is governed by equitable principles, *cf. City of Fort Worth, Tex.* v. *United States*, 188 F.2d 217, 223; *Jefferson County, etc.* v. *Tennessee Valley Authority*, 146 F.2d 564, 566, *cert. denied*, 324 U.S. 871; *Orange State Oil Co.* v. *Jacksonville, etc.*, 110 So.2d 687, 690; and the most

suitable or useful rule perhaps is that which will allow the judge, except when the evidence in question is obviously inadmissible, to have before him all the elements of evidence and indications of value which may help him to form a correct judgment of what the amount of just compensation should be.[8]

As to the case at bar, the defendants set forth that the witness, Mr. Archevald "would testify about his activities in relation to the condemned properties and he would testify that the value as of the time of the taking was $2 per square meter in Parcel A and in Parcel B the value was $27.150, the fair value of the parcel." (Record, p. 413. Upon submitting the case they announced that the value of the land was $2. per meter.) Assuming that if the witness had testified, the record would have shown that this was the assessed value for the purposes of property taxation, which would have meant that it represented at law the *actual and effective* value thereof, the evidence could have been admitted

---

[8] Wigmore (3d ed. Vol. 5, p. 552, § 1640) referring to the official records of assessment states that: "It is also true that in many communities the assessment-book notoriously assesses values far below the actual standards; and that in others the assessor accepts without question the owner's filed statement; where these practices prevail, it is simple enough to reject those particular books as untrustworthy evidence of value, and as inadmissible. But where the books are not thus notoriously untrustworthy, there seems to be no sound objection to receiving them. No one maintains that they are conclusive; but at least they afford some evidence to a rational mind seeking the truth." *Cf. In re Site for Memorial Hall*, 25 N.W.2d 174, 176; *Louisville & N.R. Co.* v. *Burnam*, 284 S.W. 391, 395; *City of New Orleans* v. *Larroux*, 14 So.2d 812, 813; *Equitable Life Assur. Soc.* v. *Kevitt*, 54 N.Y.S. 2d 643, 651–652; *McCandless* v. *United States*, 74 F.2d 596, 604; *Donaldson* v. *Greenwood*, 242 P.2d 1038, 1046; *In re Boardwater Supply*, 130 N.Y.S. 997, 999–1000; *Krider* v. *City of Philadelphia*, 36 Atl. 405; *Louisiana Highway Commission* v. *Giaccone*, 140 So. 286, 290.

It does not seem to me that the provision added to § 3 of Act No. 117 of 1947 by Act No. 228 of 1950 in the sense that the returns, cards, maps, photographs, plans, etc. and all other information obtained and used by the Treasurer in the scientific assessment constitute prima facie evidence, for taxation purposes, of the circumstances and of the assessed valuation, and as such shall be admitted as evidence, has the effect to declare the assessed value as inadmissible evidence in other cases.

under the circumstances of this case, if not as conclusive in fixing the compensation, as stated by the authorities, at least as an indication of the *actual* value fixed by one of the parties to the lawsuit, to be taken into consideration together with the rest of the evidence. If in a valuation contemporary to the one made for the purposes of this condemnation, the government had fixed to the property an actual and effective value of $2 in order to impose a tax thereon, this evidence may be material to the rational mind of a judge seeking the truth, as stated by Wigmore, with regards to the weight and degree of correction which he might grant to the testimony of an expert of the government itself who fixed to the property at that same date a value of $0.75 per square meter for the purposes of just compensation, in the absence of a reasonable explanation. Particularly if, as the record shows, the assessment for taxation purposes could have been done under the general supervision of this expert.

The trial judge applied rules that were too severe from the viewpoint of procedure in not permitting the witness to testify, and to my judgment his determination to that effect was erroneous. In remanding this case for further proceedings, I would instruct the Judge to permit the witness to testify if called by the defendants.

